## Mary C. O'Brien *vs.* New England Telephone & Telegraph Company & another.[1]

Hampden. December 5, 1995. - May 17, 1996.

Present: Liacos, C.J., Wilkins, Abrams, Lynch, O'Connor, & Fried, JJ.

*Employment,* Termination, Personnel manual. *Contract,* Employment, Interference with contractual relations. *Labor,* Grievance procedure. *Damages,* Attorney's fees. *Practice, Civil,* Attorney's fees, Costs.

Evidence in a civil action warranted a finding that the defendant unlawfully and intentionally interfered with the plaintiff's employment relationship, that the defendant's conduct towards the plaintiff was motivated by actual malice unrelated to the employer's legitimate corporate interests and that the defendant's treatment of the plaintiff caused her to commit the misconduct that led to her discharge. [687-688, 690]

Discussion of the holdings of *Jackson* v. *Action for Boston Community Development, Inc.,* 403 Mass. 8 (1988), and of cases from other jurisdictions, considering whether the terms of a personnel manual are part of an express or implied employment contract. [690-694]

In the circumstances of an employer-employee relationship, the employer's personnel manual, distributed to employees from time to time and which contained no reservation of rights or disclaimer of obligations, granted the employee rights beyond those of an at-will employee, specifically with respect to rights under the disciplinary procedures set forth therein. [694-695]

An employee who did not follow an applicable grievance procedure set forth in her employer's personnel manual was not entitled to maintain an action against the employer for wrongful termination of employment, asserting a right under the personnel manual against unfair treatment. [695-696]

A plaintiff who prevailed on a claim for intentional interference with her contractual relations with her employer was not entitled to an award of attorney's fees and costs in pressing that claim; nor was that defendant, in the circumstances, liable for counsel fees incurred by the plaintiff in pursuing a contract claim against the employer, where the plaintiff had had another remedy and did not demonstrate that she was required to bring the action against the employer to vindicate her rights. [696-697]

Civil action commenced in the Superior Court Department on March 2, 1990.

[1]Edwin H. Hurley, Jr.

The case was tried before *Constance M. Sweeney*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Pamela A. Smith* for the defendants.

*Edward J. McDonough, Jr.* (*William C. Flanagan* with him) for the plaintiff.

*Stephen S. Ostrach*, for New England Legal Foundation, amicus curiae, submitted a brief.

WILKINS, J. Mary C. O'Brien was awarded judgment against Edwin H. Hurley, Jr., for intentional interference with her contractual relations with her employer, New England Telephone & Telegraph Company (NET). She was also awarded judgment against NET for wrongful termination of her implied contract of employment. We allowed the defendants' application for direct appellate review.

Hurley, who was O'Brien's supervisor in NET's marketing department in Springfield, argues that the judge should not have submitted the claim against him to the jury. We shall determine that the jury could reasonably have concluded that Hurley's treatment of O'Brien maliciously interfered with O'Brien's rights and precipitated her discharge.

Although NET contends that O'Brien was only an at-will employee and, therefore, could be discharged without cause, we shall conclude that NET's personnel manual granted O'Brien rights beyond those of an at-will employee. Those rights, however, had to be asserted first through the grievance procedure set forth in the manual. Because O'Brien did not pursue that course, she lost whatever rights that the personnel manual provided her. Judgment must be entered in favor of NET.

We shall first explain why the verdict against Hurley for intentional interference with contractual relations should be upheld. Next, we shall explain why O'Brien may not recover against NET.

1. We reject Hurley's argument that the evidence did not warrant a finding that he unlawfully and intentionally interfered with O'Brien's employment relationship. We have little difficulty in concluding that the jury were warranted in finding that Hurley's conduct toward O'Brien was motivated by "actual malice" and was not related to NET's legitimate corporate interests. See *Wright* v. *Shriners Hosp. for Crippled*

*Children,* 412 Mass. 469, 476 (1992); *Gram* v. *Liberty Mut. Ins. Co.,* 384 Mass. 659, 663-664 (1981), *S.C.,* 391 Mass. 333 (1984). Although the question is a closer one, the jury were also warranted in finding that Hurley's treatment of O'Brien caused her to commit the misconduct that led to her discharge.

The jury could have found the following facts. O'Brien first went to work for NET in 1956 as a general clerk in the division traffic office in Springfield, where she worked for twenty-two years, had a good relationship with fellow workers, and was never reprimanded or disciplined. Thereafter she worked in two other NET departments without adverse incident. In December, 1982, she joined the marketing department headed by Hurley. In 1983, Hurley rated O'Brien's performance as satisfactory in an evaluation, although he indicated that she could use her time more effectively. In 1984, Hurley asked O'Brien to fill out a transfer form because there was a surplus of clerks in the department, and he wanted her to be transferred. O'Brien, who believed that her seniority would protect her from being transferred against her will, refused Hurley's request and filed a grievance. A NET personnel manager upheld the grievance on the basis that the terms of NET's personnel manual protected O'Brien from involuntary transfer in the circumstances.

After O'Brien's grievance was upheld, Hurley became very hostile toward O'Brien. He screamed and yelled at her over small things every day, often in front of other people in the office. He called her stupid, the "nitwit in the north end," "the Blessed Mother," and "loony tunes." A witness heard Hurley scream at O'Brien and call her a "whore," "prostitute," and "slut." He described Hurley's outbursts toward O'Brien as temper tantrums. One could hear Hurley yelling at her all over the building. Hurley would persist until O'Brien started shaking and crying. When Hurley made O'Brien cry, "that was like his victory."

Hurley wanted O'Brien out of the department. He gave her work to other people and refused to let her do work that she had been trained to do. He also refused to give her a key to the supply closet to obtain supplies, although the junior clerk was given a key, and, in the past, O'Brien always had been given access. Hurley refused to discuss with O'Brien why he had ceased to give her work. In his performance evaluation of

O'Brien in 1985, after she had successfully grieved the attempted transfer, Hurley reported that O'Brien's performance was "unsatisfactory" and that she "has been told of her deficiencies. Her overall skills do not let her perform in a satisfactory manner." He also reported that "she procrastinates, is unable to prioritize, needs constant direction, and is much too deliberate in her duties." O'Brien refused to sign this evaluation.

One day in October, 1985, while O'Brien was typing her notes regarding her relationship with Hurley, pursuant to a direction by a NET personnel manager, Hurley came out of his office, took her notes (which she seized back), and told her to leave and to leave everything on her desk. Hurley suspended O'Brien for three days without pay. Upon her grievance of the suspension, a NET personnel manager rescinded the three-day suspension; changed the discipline to one day off without pay; ordered that the discipline letter be rewritten to eliminate any reference to a suspension; and promised O'Brien that all memos and correspondence regarding the suspension would be removed from her file.

In 1987, after O'Brien had obtained payroll training, Hurley refused to give her any opportunity to practice doing the payroll work. One time when he asked her to do the payroll he yelled at her because she expressed some concern about her lack of practice. When she grieved this issue, Hurley was directed to allow O'Brien to do the payroll occasionally so she could get some practice. Hurley did not fully comply with this directive.

Hurley's harassment of O'Brien continued. Some days O'Brien had no work to do. Hurley gave secretarial work to a salesperson in the department who was not a clerk. Toward the end of 1989, O'Brien believed that Hurley and the salesperson were spending time together and confirmed her suspicions by making telephone calls to Hurley's office, to his home, to the salesperson's office, and once to her home. O'Brien never said anything during any of the telephone calls. She simply hung up. O'Brien was concerned that the salesperson was taking over her job. At Hurley's request, NET traced the "hang-up calls" to O'Brien. She admitted making them and that it was wrong to do so. She was immediately suspended. About one week later, NET terminated her employment on the stated ground that annoyance calls

were a violation of criminal laws and a violation of NET's Code of Business Conduct. O'Brien did not file a grievance concerning her termination.

Although Hurley argues that his treatment of O'Brien was consistent with his supervisory responsibilities, the jury were warranted in finding that Hurley's conduct exceeded his rightful role as O'Brien's supervisor and was prompted by his resentment of O'Brien's successful challenges to his decisions and her refusal to transfer out of his department. Screaming at an employee repeatedly to humiliate her in front of other employees, calling her names, and denying her work to do when work is available could be found both to exceed the protected conduct of a supervisor and to constitute malicious conduct unrelated to an employer's legitimate business interests.

Hurley has suggested in his brief that the jury could not reasonably have found that his treatment of O'Brien caused her to make the "hang-up" telephone calls that caused NET to discharge her. Certainly a finding was warranted that O'Brien would not have made the "hang-up" telephone calls if Hurley had not treated her as he did.[2]

2. Next, we come to O'Brien's claim that NET violated her contract of employment by discharging her without cause. O'Brien, who had no written contract, was an at-will employee unless the provisions of NET's personnel manual, entitled "Personnel Practices," altered her status. There was nothing in O'Brien's other dealings with NET that gave her greater rights than those that we conclude she had under NET's personnel manual. O'Brien contended at trial that NET's personnel manual provided her protection from dismissal without cause. NET, in turn, argued that, because the manual granted O'Brien no enforceable rights, there was no jury issue as to whether NET had cause to discharge O'Brien. NET also contended that, even if the manual did grant O'Brien contractual rights, O'Brien's claim also failed because (1) she did not pursue the grievance procedures of the person-

---

[2]The evidence might not warrant a finding that O'Brien violated G. L. c. 269, § 14A (1994 ed.). A conviction of making repeated harassing or annoying telephone calls requires proof that the "sole purpose" of the calls was to harass or annoy. In any event, O'Brien's conduct, particularly for a telephone company employee who had signed NET's Code of Business Conduct, was particularly inappropriate.

nel manual and (2) in any event, O'Brien's admittedly improper conduct provided just cause for her discharge. We conclude that NET's motion for a directed verdict (or at least its motion for judgment notwithstanding the verdict) should have been allowed.

The principle that promises made in a personnel manual may be binding on an employer is accepted in a clear majority of American jurisdictions. See Comment, Unilateral Modification of Employment Handbooks: Further Encroachments on the Employment-at-Will Doctrine, 139 U. Pa. L. Rev. 197, 208-209 n.76 (1990) (citing cases from thirty-three States and the District of Columbia). There are differences among the States as to the theory of liability (unilateral contract or promissory estoppel), *id.* at 209, and there are differences as to what circumstances justify a finding that the provisions of a personnel manual are binding on an employer. The idea that an employer may ignore promises made in a personnel manual is in increasing disfavor in this country. See *Small* v. *Spring Indus., Inc.,* 292 S.C. 481, 485-486 (1987).

Since our opinion in *Jackson* v. *Action for Boston Community Development, Inc.,* 403 Mass. 8 (1988), in which we last considered the question of personnel manuals, some confusion has arisen. In that opinion, we held that the summary judgment evidence demonstrated that the parties had not entered into an implied contract on the basis of a personnel manual that the defendant employer had distributed to its employees. *Id.* at 14.

Principles stated in the *Jackson* opinion remain sound. A personnel manual may form the basis for an express contract. *Id.* at 13. Surely, if the parties agree in advance of employment that a personnel manual will set forth relative rights and obligations of employer and employee, the manual becomes part of the employment contract. A similar result would be obtained if, during the course of at-will employment, the parties agree, orally or in writing, that thereafter their rights and obligations would include the provisions of an employee manual. An employee remaining with the employer after receiving a manual provides the consideration necessary to support the contract. *Id.* at 14. It is also apparent that the circumstances of a particular employment relationship could warrant a finding of an implied contract that includes the terms of a personnel manual. *Id.* If an employer

adheres to the procedures set forth in its manual, that would be some evidence that the terms of the manual were part of the employment contract. *Id.*

The *Jackson* opinion has led to confusion because certain facts that were stated to be present or not present in that case (*id.* at 14-15) have been viewed as constituting a list of conditions that must exist in order to justify a ruling that the terms of a personnel manual are part of an express or implied employment contract. See *Pearson* v. *John Hancock Mut. Life Ins. Co.*, 979 F.2d 254, 256-257 (1st Cir. 1992); *Biggins* v. *Hazen Paper Co.*, 953 F.2d 1405, 1423-1424 (1st Cir. 1992), vacated on other grounds, 507 U.S. 604 (1993); *Cadrin* v. *New England Tel. & Tel. Co.*, 828 F. Supp. 120, 122 (D. Mass. 1993). Cf. *O'Brien* v. *Analog Devices, Inc.*, 34 Mass. App. Ct. 905, 906 (1993) (manual played no part in employment agreement because employee did not read manual until after she began her employment); *Mullen* v. *Ludlow Hosp. Soc'y*, 32 Mass. App. Ct. 968, 969 (1992) (no contract because terms of manual were not negotiated, manual was received after employee began working, employer could change manual unilaterally, and manual said it was not a contract).

The various circumstances discussed in the *Jackson* opinion are not a rigid list of prerequisites, but rather explain factors that would make a difference or might make a difference in deciding whether the terms of a personnel manual were at least impliedly part of an employment contract. For example, one of the *Jackson* factors is whether there had been negotiations over the terms of the personnel manual. *Jackson*, *supra* at 15. If there had been negotiations leading to an agreement, that fact alone would justify the conclusion that more than an at-will employment contract existed. The fact that the NET manual was not the subject of negotiation is neither significant nor surprising. Negotiation of the terms of a company-wide manual for nonunion employees is not likely and is not an essential precondition of the enforceability of the employer's obligations stated in the manual. Of course, if a manual furnished to an employee stated a term of employment, the employee would not be an at-will employee. *Id.*

The *Jackson* opinion thought significant, in support of its result, that the employer retained the right unilaterally to modify the terms of the manual because that made any offer in the manual illusory. *Id.* at 14-15. On the other hand, if an employee reasonably believed that the employer was offering

to continue the employee's employment on the terms stated in the manual, the employee's continuing to work after receipt of the manual would be in the nature of an acceptance of an offer of a unilateral contract (see *Pine River State Bank* v. *Mettille*, 333 N.W.2d 622, 626-627 [Minn. 1983]), and the promise would not be illusory. The fact that the employer did not intend to make such an offer, and that there was no explicitly bargained-for exchange, does not matter if employees in general would reasonably conclude that the employer was presenting the manual as a statement of the conditions under which employment would continue. See Restatement (Second) of Contracts § 24 (1979) ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it").

The *Jackson* opinion also indicates that a finding that the terms of a personnel manual are part of an employee's contract would be supported if the employee signed the manual, manifested assent to it, or acknowledged understanding of its terms, or if the employer called special attention to the manual. *Jackson*, *supra* at 15. Although O'Brien did not sign the personnel manual (the document that contains whatever contractual rights that she may have beyond those of an at-will employee), there was evidence that she received a new copy of the manual annually.

Of course, the provisions of a personnel manual on analysis may grant no rights. The *Jackson* opinion noted that, if the manual states that it provides only guidance as to the employer's policies (*id.*), it may not create any enforceable rights. Other language in the manual or employment practices may demonstrate otherwise. The NET manual of personnel practices states that it applies to all nonmanagement employees not covered by collective bargaining agreements. In no place does it state that NET reserves the right unilaterally to change the provisions of the manual or to discharge any employee without cause.[3] It does, however, provide more than general guidance as to the employer's policies.

---

[3]As to amendments, the manual states that "[a]ny changes, revisions and additions to these practices must be authorized in writing by the Managing Director - Labor Relations and Safety." This language does not assert a unilateral right to change the manual that employees would reasonably understand to exist. The annual distribution of new manuals, however, may support the view that there was a right unilaterally to amend the manual.

Management distributes personnel manuals because it is thought to be in its best interests to do so. Such a practice encourages employee security, satisfaction, and loyalty and a sense that every employee will be treated fairly and equally. See *Toussaint* v. *Blue Cross & Blue Shield of Mich.*, 408 Mich. 579, 613 (1980). Management expects that employees will adhere to the obligations that the manual sets forth. Courts recently have been reluctant to permit management to reap the benefits of a personnel manual and at the same time avoid promises freely made in the manual that employees reasonably believed were part of their arrangement with the employer. Management voluntarily offers, and defines the terms of, any benefit set forth in its unbargained for personnel manual. The employees may have a reasonable expectancy that management will adhere to a manual's provisions. "Without minimizing the importance of its specific provisions, the context of the manual's preparation and distribution is, to us, the most persuasive proof that it would be almost inevitable for an employee to regard it as a binding commitment, legally enforceable, concerning the terms and conditions of his employment." *Woolley* v. *Hoffmann-La Roche, Inc.*, 99 N.J. 284, 299, modified on other grounds, 101 N.J. 10 (1985). In the circumstances of this case, an affected employee's reliance on the manual would be reasonable, and O'Brien, as one of those employees, is entitled to whatever rights that the manual sets forth.

We need not now define the extent to which management may effectively reserve its right to change or withdraw a manual, or some part of it, or the extent to which management may successfully provide that the manual from its inception or by its amendment creates no rights at all. See Befort, Employee Handbooks and the Legal Effect of Disclaimers, 13 Indus. Rel. L. J. 326, 348-349, 369-370 (1991/1992). NET did not explicitly purport to retain the right unilaterally to modify the personnel manual. See note 3, above. The personnel manual, distributed to employees and amended from time to time, contained no reservation of rights or disclaimer of obligations. Indeed, NET appears to have followed the manual's procedures as a regular administrative practice and did so specifically in regard to O'Brien's grievances.

NET's personnel manual does not provide that an employee may be discharged only for cause, but it does give each employee the right to expect that she will be treated fairly, and that, except in the case of "certain gross violations of rules and other offenses," any shortcomings would not be grounds for immediate discharge. Rather, discipline was generally promised to be progressive.[4] The manual provides a grievance procedure involving "a complaint that an employee has, in any manner, been unfairly treated." The stated procedure, which provides for four steps (if suspension or termination is involved), requires that "[g]rievances must be presented initially within thirty (30) calendar days of the occurrence which gave rise to the grievance."

O'Brien did not follow the grievance procedure, and that omission, as a matter of law, is fatal to her claim that NET violated the terms of her employment. O'Brien knew of the grievance procedure (she had notice of it in any event) and had used it successfully. She cannot assert a right against unfair treatment under one part of her employment contract and fail to follow procedures set forth in another part of that contract that could provide relief from that unfair treatment. The grievance procedure was not optional in the sense that O'Brien could assert a violation of rights under the personnel manual without following the grievance procedure. It was an optional procedure only in that an employee with a grievance could decide not to pursue the grievance.

When a collective bargaining agreement provides a grievance procedure, the general rule is that the remedies specified in the agreement must be exhausted before an employee may resort to the courts. See *Vaca* v. *Sipes*, 386 U.S. 171, 184 (1967); *Balsavich* v. *Local 170, Int'l Bhd. of Teamsters*, 371 Mass. 283, 286 (1976) ("Employees may not simply disregard the grievance procedures set out in a collective labor contract

---

[4]Section 5.02 of the manual provides as follows: "Consideration will be given to the question of retaining any employee who is unsuitable or deficient. The Company will attempt to warn employees and help them overcome any shortcomings. Generally entries will be made on the employee's service record of such warnings and efforts, and the employee should be notified at that time. At the same time, certain gross violations of rules and other offenses may be considered as cause for immediate discharge. In such cases progressive discipline will not be given; the employee, however, may be suspended pending a review of facts for a final determination."

and go direct to court for redress against the employer''); *Norton* v. *Massachusetts Bay Transp. Auth.*, 369 Mass. 1, 2 (1975). We see no justification for treating differently an employee asserting rights under a personnel manual that contains a grievance procedure where none of the limited exceptions to the exhaustion requirement, noted in the cited cases, applies. See also *Glover* v. *St. Louis-San Francisco Ry.*, 393 U.S. 324, 329-331 (1969).

The grievance procedure provided a ready means by which O'Brien could have brought to the attention of management Hurley's unfair treatment of her and the reason why she made the "hang-up" telephone calls. Pursuit of this available process might have demonstrated sufficient mitigating circumstances to rebut what management might otherwise have perceived as "gross violations" of rules or law that were "cause for immediate discharge." Because O'Brien failed to pursue the grievance procedure, we need not decide whether, as a matter of law, her improper conduct justified her discharge on some standard that the personnel manual might be read to prescribe (fair treatment, existence of a gross violation, or otherwise).

3. The trial judge ruled that Hurley was liable to O'Brien for all her counsel fees and expenses in this action. The trial judge did not distinguish between counsel fees that O'Brien incurred in pursuing her tort claim against Hurley and counsel fees that she incurred in pursuing her contract claim against NET.

There is no authority allowing a plaintiff in an action for interference with a contractual relationship to recover counsel fees incurred in pressing that claim. That conclusion is consistent with the general rule that each litigant bears the cost of her own litigation. See *Linthicum* v. *Archambault*, 379 Mass. 381, 389 (1979). O'Brien is not, therefore, entitled to an award of counsel fees with respect to her claim against Hurley. Cf. *M.F. Roach Co.* v. *Provincetown*, 355 Mass. 731, 733 (1969) (plaintiff "can be allowed only those counsel fees incurred in suing the third party").

There are limited circumstances in which counsel fees are properly awarded. See *Bournewood Hosp., Inc.* v. *Massachusetts Comm'n Against Discrimination*, 371 Mass. 303, 311-312 (1976). Where a defendant has intentionally interfered with a plaintiff's contractual relations, the plaintiff may, as a

result, incur attorney's fees in dealing with third parties, when, for example, as a result of the wrong, the plaintiff is sued by some third party. See *Mailhiot* v. *Liberty Bank & Trust Co.*, 24 Mass. App. Ct. 525, 531 (1987). Also, when the plaintiff is forced to sue a third party to hold it to the bargain with which a defendant intentionally and wrongfully interfered, attorney's fees in that action may properly be awarded against the tortfeasor. *Id.* at 532. *M.F. Roach Co.* v. *Provincetown, supra* at 732. Of course, if the plaintiff had no rights against the third party, she would not be entitled to counsel fees incurred in asserting those nonexistent rights. *Id.*

If O'Brien had prevailed in her action brought against NET to protect those interests with which Hurley wrongly interfered, Hurley would be liable for O'Brien's attorney's fees and expenses incurred in pursuing NET. It may be that a tort defendant in Hurley's position would be liable for attorney's fees and expenses that the wronged party incurred as an unsuccessful plaintiff in an action reasonably prompted by the tortfeasor's misconduct. The rule is, however, that to recover attorney's fees and expenses the wronged party must have been required by the wrongdoer's conduct to bring the action against the third party. See Restatement (Second) of Torts § 914 (2) (1979). Because O'Brien could have, and should have, followed the grievance procedure set forth in the manual, she was not required to maintain an action against NET to protect her rights. She had successfully pursued grievances at NET in the past and made no showing that it would have been futile to do so again.

4. The verdict against the defendant New England Telephone & Telegraph Company is vacated, and judgment shall be entered for it. The judgment against Edwin H. Hurley, Jr., is modified by deleting the award of attorney's fees and expenses and, as so modified, is affirmed.

*So ordered.*