Fabricant, J.
Plaintiff Thomas Vaughan filed this action against his former employer and others, asserting various claims based on the employer’s response to an accusation of harassment made against him by defendant Christina Gizara. Presently before the Court is the motion of defendants XRE/ADC Corp. (XRE), John Grady, James Thomasch and Maura Tuohy for summary judgment on Counts I (defamation) and V (breach of contract). For reasons set forth below, defendants’ motion is ALLOWED.
BACKGROUND
For some period of time prior to February of 1994, Vaughan and Gizara were coworkers at XRE.[2] Grady is president of XRE; Thomasch is an XRE vice-president, and Tuohy is XRE’s personnel manager. On January 31, 1994, Gizara complained to Tuohy about harassment in the workplace. Some time earlier, Gizara had complained to Tuohy of harassment by Grady and others, not including Vaughan, but had declined to authorize Tuohy to take action on her complaints.
In affidavits and deposition testimony, Gizara and Tuohy give somewhat varying versions of their conversation of January 31, 1994. According to Tuohy, Vaughan was the sole target of Gizara’s complaints at that time. Gizara’s version is that she renewed her earlier complaints about Grady and others, and “also told Tuohy that I was upset with Mr. Vaughan over several incidents,” although “at no time did I state that he was sexually harassing me.” Notwithstanding these differences, Gizara does not contradict Tuohy’s deposition testimony that Gizara told her that as a result of Vaughan’s conduct “she could not sleep at night, that she was sleeping with a knife under her pillow, and that she was afraid [Vaughan] was going to follow her home.”
Tuohy began an investigation of Gizara’s allegations against Vaughan. According to her uncontradicted deposition testimony, she spoke with two other employees who had witnessed incidents reported by Gizara, and received corroborating accounts. Tuohy concluded that “I needed to have some assurance that he was safe to be at work and did not pose a threat to any employee.”
Tuohy met with Thomasch, and the two prepared a memorandum, dated February 3, 1994, addressed to Vaughan. The memorandum informed him that Gizara had reported “the situation” between them, that “the behavior you have shown towards her makes her feel uncomfortable in the work place,” and that her complaint “is now being investigated as a formal action.” The memorandum went on to indicate that, based on “reviewing the details" with Gizara, “we feel you have crossed the boundaries of what constitutes acceptable work place behavior . . . there is evidence that you have exhibited sudden outbursts of anger ... in response to [Gizara] not accepting your offerings of help and expressions of gratitude.” The memorandum expressed the conclusion that “another employee feels unsafe at work, and this constitutes harassment.” Based on this conclusion, the memorandum notified Vaughan that he would be required to take an immediate paid leave of absence, during which time he would meet with Dr. Clouse, a clinical psychologist, who would “help both you and us better understand this situation and reassure us as to whether you are able to return to work.” The memorandum went on to “emphasize that . . . we must consider this a very serious matter. At the same time we are committed to helping you because we consider you a valuable employee. In this regard, we will allow you the time off from work, with full pay, while being evaluated . . . Notwithstanding any of the above, your behavior is totally unacceptable and any further incidents of similar inappropriate behavior will result in additional disciplinary actions, including possible termination" (emphasis in original). The memorandum did not use the phrase “sexual harassment.”
On February 4, 1994, Tuohy and Thomasch met with Vaughn and informed him of Gizara’s allegations. According to Tuohy’s deposition testimony and affidavit, Vaughan did not deny the incidents underlying the *665 allegations, and conceded that he did not cease his behavior when Gizara asked him to stop. Vaughn, in his deposition testimony and affidavit, does not contest these statements, but does assert that he “vehemently denied that I ever sexually harassed Ms. Gizara, was ever romantically involved with her or ever made sexually inappropriate comments to her.” In an effort to prove the nature of his relationship with Gizara, he proffered copies of e-mails between the two, which Tuohy and Thomasch declined to review. Tuohy and Thomasch presented Vaughan with their previously prepared memorandum, initiating his paid leave of absence. There is no evidence that Thomasch and/or Tuohy ever gave the memorandum to anyone other than Vaughan, or that any third party ever saw it.
Tuohy then sent Dr. Clouse a letter, dated February 7, 1994, requesting “your professional opinion as to whether Mr. Vaughan is able to return to work without posing a risk to either himself, other company employees and, most specifically, Ms. Christina Gizara, who filed a complaint of harassment against Mr. Vaughan last Monday, January 31.” The letter further stated, “[a]s background information on the complaint and the investigation we have conducted to date, it is clear that Mr. Vaughan did engage in a persistent pattern of behavior toward Ms. Gizara over an extended period of time (approximately 14 months, beginning in December 1992) . . . Mr. Vaughn does not deny the behavior in question, which included his writing her numerous notes and cards, verbal invitations for meals and drinks, and various gifts . . . despite repeated attempts by Ms. Gizara to discourage . . . this type of behavior, his overtures toward her did not cease. On occasion, Mr. Vaughan has become upset or expressed confusion if Ms. Gizara denied him the opportunity to assist her in some way ... or by refusing to let him buy her something.” The letter asked Dr. Clouse “to evaluate and report back to us whether you believe Mr. Vaughan will be able to refrain from this type of inappropriate behavior when he returns to work.” The letter did not use the phrase “sexual harassment.” There is no indication in the record that the letter was ever seen by anyone other than Dr. Clouse. Dr. Clouse, at his deposition, testified that Tuohy’s letter, while providing “background information of what he was being accused of . . . had no bearing on my assessment of his psychological state ... I wasn’t assessing whether he did or didn’t do these things or doing a performance appraisal or anything like that. I was assessing his psychological state.”
Vaughan met with Dr. Clouse four times, with the final session including administration of what Vaughan describes as a Rorschach test, and Dr. Clouse refers to as “standardized psychological testing." Vaughan, according to his affidavit, offered Dr. Clouse the same e-mails he had offered Tuohy and Thomasch, but Dr. Clouse declined to review them. In a letter dated February 17, 1994, Dr. Clouse reported to Tuohy his conclusions and recommendations. Stating that his “(diagnostic impressions and testing results matched almost exactly,” he expressed the view that Vaughan had “significant problems of impulse control,” along with “a significant problem of emotional control,” "stubborn, persistent, distorted notions of himself and others,” and “faulty judgment.” Dr. Clouse also noted that Vaughan'had “admitted to intermittent alcohol abuse.” Based on these findings, Dr. Clouse recommended that Vaughan engage in individual psychotherapy, attend AA meetings, and agree to “ ‘staying away from’ Ms. Gizara as a condition of continued (possibly probationary) employment.” Vaughan agreed to these conditions, although in fact he met only the first of them.[3] He was allowed to return to work, and was never subjected to any loss of pay or benefits, change of position, or other adverse action.
Within the month of February 1994, Vaughan began psychotherapy with Dr. Alexander Anderson. Dr. Alexander has submitted an affidavit, in which he states that Vaughan told him of the allegations, and “vehemently denied that he had ever sexually harassed Ms. Gizara.” Dr. Anderson reports that he reviewed the e-mails Vaughan had offered to Tuohy and Thomasch, and found “no evidence of eroticism or sexuality . . . but rather what appeared to be a voluntary and supportive co-worker relationship.” Dr. Anderson opines that Dr. Clouse’s findings were “speculative at best,” and that “there is no support in the scientific community for the use of a Rorschach test to infer personality characteristics such as impulsivity.” He reports that soon after his first meeting with Vaughan, he telephoned Tuohy and “expressed my concerns regarding Mr. Vaughan’s guilt and XRE’s failure to properly investigate,” as well as “my concerns over Dr. Clouse’s report and how seriously flawed this report was for the purpose of making any decisions on Mr. Vaughan’s treatment, let alone his guilt or innocence.” Dr. Anderson reports that he offered to speak further with Tuohy and Thomasch, but that, after Tuohy indicated that she would confer with Thomasch, he heard nothing further from XRE.
At her deposition, Tuohy acknowledged the communication from Anderson, and indicated that she discussed it with Thomasch and was advised to “add Dr. Anderson’s findings to the file.” Asked her reasons for not taking other action, Tuohy explained that “one of my major concerns was that he was okay to be at work, and they [Clouse and Anderson] both agreed that he was.”
On February 22, 1994, attorney David Rapaport, on behalf of Gizara, sent Grady an 11-page letter setting forth detailed allegations against Grady, other management personnel, and Vaughan. Characterizing the overall pattern of Gizara’s experience at XRE as “sexual harassment,” Rapaport asserted that Gizara was feeling “helpless and on the verge of a nervous *666 breakdown,” and that “her situation at XRE has become completely intolerable, and she cannot continue to work there anymore.” Gizara ceased her employment at XRE as of March 2, 1994, and in April 1994, Gizara and XRE entered into a settlement of her claims, under which XRE paid her $15,000, and she released all claims against XRE and the personnel against whom she had complained, including Vaughan.
Having learned of Rapaport’s letter and the settlement,[4] Vaughan now states in his affidavit that “I believe that defendants’ failure to fairly investigate the allegations against me was a ruse to protect senior management and make me the scapegoat.”[5] Vaughan further states that “as a result of the Defendants’ failure to fairly investigate ... I suffered severe emotional distress. I believe that this emotional distress was responsible, in large part, for the stress-related gran mal seizure I suffered on March 12, 1994.” He offers no expert opinion to support that belief. The date of the seizure coincided with the date of Vaughan’s father’s funeral. Vaughan’s father had died on March 8, 1994, in Vaughan’s presence at a hospital emergency room, after a period of weeks in a nursing home, during which Vaughan had responsibility for signing DNR orders.
During Vaughan’s employment with XRE, the company had a “Policy Manual.” The manual began with a preface from the president, and then set forth, on its second page, a “Notice to Employees,” stating, in pertinent part, ‘The policies and procedures in this manual constitute guidelines only and are not intended to create an employment contract of any kind with any employee.” The portion of the manual entitled “Harassment” stated, in pertinent part, the following:
The Personnel Manager or Group Vice President will ensure that a thorough investigation of the complaint is conducted following procedures designed to discover the facts, to strictly preserve the confidentiality of all involved in the investigation, to prevent retaliation against the employee for bringing the complaint and against anyone who assists in the investigation, and to ensure fair treatment of the person accused of harassment.
According to Tuohy’s affidavit, XRE did not negotiate the provisions of the manual with any employee: it reserved the right to and did make changes unilaterally; and it did not ask employees to sign the manual. Vaughan does not contest these statements, and confirmed in his deposition testimony that he received a copy of the manual “probably at the date of employment,” did not sign it, did not negotiate its terms, was not consulted about any of its provisions, and was never told that it was a contract between him and XRE. Vaughan does not assert that he believed the manual was a contract, that he accepted or continued employment with XRE based on anything contained in the manual, or that he relied on its provisions in any way.
Vaughan filed this action on October 29, 1995, naming seven defendants and setting forth ten counts. Thereafter, Vaughan stipulated to dismissal of his claims against Gizara, and this Court (Graham, J.) ordered summary judgment for defendants XRE, Grady, Thomasch, and Tuohy, on Counts II (intentional and/or negligent infliction of emotional distress), III (negligent hiring), IV (negligent supervision), VII (false imprisonment) and X (violation of the Massachusetts Civil Rights Act) [5 Mass. L. Rptr. 487], Pursuant to Mass.R.Civ.P. 56(f), Judge Graham allowed Vaughan to conduct further discovery before responding to these defendants’ motion for summary judgment as to counts I and V. It is those claims, the only remaining claims as to these defendants, that are the subject of the present motion.[6]
DISCUSSION
This Court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial, like the defendants here, may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Pederson, Mass. 404 at 17. The nonmoving party cannot defeat the motion for summary judgment by resting on his or her pleadings and mere assertions of disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
1. Count I (Defamation)
Defamation is the publication of a false communication which “discredits the plaintiff ‘in the minds of any considerable and respectable segment in the community.’ ” Draghetti v. Chmielewski, 416 Mass. 808, 811 (1994) (quoting Tropeano v. Atlantic Monthly Co., 379 Mass. 745, 751 (1980)). To recover for defamation, a plaintiff must prove that publication occurred, that the material published was both false and defamatory, and that he suffered actual damages. Draghetti, 416 Mass. at 815.
Vaughan bases his defamation count on both the Tuohy-Thomasch memorandum, dated February 3, *667 1994, and the letter from Tuohy to Dr. Clouse, dated February 7, 1994. As to the memorandum from Tuohy and Thomasch, Vaughan has offered no evidence that the memorandum was published. Publication requires exposure of the document to a third party. See Bauer v. Globe Newspaper Co., 351 Mass. 53, 56-57 (1966). Nothing in the record before this Court suggests that defendants showed the memorandum to anyone other than Vaughan, or that anyone else ever saw it prior to his making it public by appending a copy of it to his complaint. Vaughan thus has no reasonable expectation of meeting his burden of proof at trial as to the Tuohy-Thomasch memorandum.
With respect to the letter from Tuohy to Dr. Clouse, there is evidence of publication, but to one person only, and that a person who, by the ethical norms of his profession, could be expected to keep confidences. There is no evidence that publication to Dr. Clouse caused Vaughan any harm, economic or otherwise.[7] Dr. Clouse expressly denies that the memorandum affected his conclusions concerning the plaintiff, and Vaughn offers nothing to the contrary beyond speculation.
More fundamentally, the publication to Dr. Clouse was conditionally privileged insofar as it was “reasonably necessary to the protection or furtherance of a legitimate business interest.” Bratt v. IBM Corp., 392 Mass. 508, 513 (1984). The business interests involved, the assurance of a safe workplace and the fulfillment of the defendants’ obligation to Gizara, clearly qualify for the privilege, and the publication to one person could hardly be viewed as excessive. Id. at 515.
To defeat the privilege, Vaughan would have to show that the defendants recklessly or knowingly disseminated false statements about him. See Id. at 514. His attempt to make this showing consists of his characterization of the letter as falsely stating that he faded to deny “sexual-harassment,” along with his assertion that defendants acted for the purpose of protecting higher management from Gizara’s accusations. The effort falls well short. The memorandum does not say either that Vaughan was accused of or that he failed to deny sexual harassment; rather, it describes specific conduct, as related by Gizara, along with Vaughan’s failure to deny the conduct alleged. Despite his assertion that he vehemently denied “sexual harassment,” Vaughan offers no evidence that he ever denied the conduct specifically set forth in the memorandum, or that it did not occur. Without such evidence, there is nothing to support his claim of falsehood. Without a showing of falsehood, the defendants’ subjective purpose in making the statements, even if assumed to be as the plaintiff asserts, is irrelevant. Accordingly, no dispute of material fact exists as to the defamation claim, and summary judgment must be allowed.
2. Count V (Breach of Contract)
Vaughan bases his breach of contract claim on the XRE personnel manual, asserting that XRE breached the provision of the manual regarding “harassment” by failing to conduct a “thorough investigation” of Gizara’s complaint, to follow “procedures designed to discover the facts,” and “to ensure fair treatment of the person accused.”
A personnel manual may form the basis of a binding contract where an employee reasonably relies on promises and benefits set forth therein. O’Brien v. New England Tel.& Tel. Co., 422 Mass. 686, 694-95 (1996). In determining whether the terms of an employee manual impliedly formed part of an employment contract, the factors set forth in Jackson v. Action For Boston Community Dev., Inc., 403 Mass. 8, 14-15 (1988), provide guidance. O’Brien, 422 Mass. at 692. Those factors include: whether the manual contains language either purporting to express binding promises or disclaiming such intention; whether the employer retained the right to modify the manual unilaterally; whether any negotiation occurred between employer and employee over the terms of the manual; whether the manual states any term of employment; and whether employees sign the manual or otherwise manifest assent to its terms.
Here, none of these factors supports the plaintiffs claim. The manual itself expressly disclaims any contractual effect. XRE did not negotiate the provisions of the manual with any employee; it reserved the right to and did make changes unilaterally; and it did not ask employees to sign the manual. Vaughan did not sign the manual, did not negotiate its terms, was not consulted about any of its provisions, and was never told that it was a contract between him and XRE. He does not assert that he believed the manual was a contract, that he accepted or continued employment with XRE based on anything contained in the manual, or that he relied on its provisions in any way. Cf. O’Brien, 422 Mass. at 691 (an employee’s continued employment after receiving a manual can provide consideration for a contract).
Perhaps most significant, the particular policy provision at issue hardly lends itself to enforcement in contract. The provision does not specify any particular manner in which complaints of harassment will be investigated, or in which the interests of persons accused will be safeguarded. Rather, it employs vague, general terms indicative more of goals or objectives than of firm commitments. In this regard, the harassment provision is particularly consistent with the characterization expressed in the manual’s disclaimer; that is, it is merely a guideline, not an enforceable promise.[8] Accordingly, Vaughan’s breach of contract claim fails as matter of law for lack of any evidence of the existence of a contract.
*668 ORDER
For the foregoing reasons, it is hereby ORDERED that defendants’ motion for summary judgment is ALLOWED with respect to Counts I and V of the complaint.

 Neither is still employed with XRE. Vaughan has not raised any issue in this case with respect to the circumstances of his termination.

 Vaughan apparently received some alcohol treatment from his individual psychotherapist. The issue of his staying away from Gizara became moot upon her termination from XRE on March 2, 1994.

 Vaughan states in his affidavit that he received a “heavily redacted” copy of Rapaport’s letter from Gizara’s counsel on or about February 28, 1995. He does not indicate when or how he obtained access to the entire letter and to the settlement agreement.

 This belief appears to rest at least in part on Tuohy’s deposition testimony that she never investigated Gizara’s complaints concerning Grady, and never sent Grady for counseling. Tuohy believed that Thomasch spoke with Grady about Gizara’s complaints, but denied knowledge of Grady’s response.

 Count VIII, asserting negligent supervision of Dr. Clouse against Marlborough Hospital, and Count IX, asserting malpractice against Dr. Clouse, remain pending.

 At argument on the present motion, Plaintiffs counsel conceded that plaintiffs claims of emotional distress and physical injury (the gran mal seizure) would be barred by the exclusivity provision ofthe Workers’ Compensation Act, G.L.c. 152, §24, even if he could prove causation.

 The harassment policy is particularly inappropriate for enforcement as a contract for another reason: its inclusion in the XRE manual served to notify employees of their statutory rights under G.L.c. 151B, §§1-9, rather than to create any additional rights. See Charella v. Phoenix Technologies Ltd., 32 Mass.App.Ct. 919, 921 (1992) (an equal employment opportunity policy did not create contractual rights to support breach of contract).