Connolly, Thomas E., J.
This is a wrongful discharge action brought by the plaintiff, Jose Ortega (“Ortega”), against his employer, Wakefield Thermal Solutions, Inc. d/b/a Wakefield Engineering (“Wake-field”). This matter is now before the court on Wakefield’s motion for summary judgment. For the reasons discussed below, that motion is Denied.

Facts

The jury would be entitled to believe the following facts.
Ortega was an employee of Wakefield for 22 years, and worked himself up within the company to the level of supervisor. Ortega was being paid $16.50 per hour at the time he was fired. As requested by Wakefield, Ortega generally worked fifteen (15) to twenty (20) overtime hours a week. On May 8, 2001, Ortega was supplied with a copy of the Wakefield Engineering Employee Handbook (“the Handbook”), and he signed a written acknowledgment that he had received said Handbook.[1] Also included in the signed acknowledgment was the following statement:
I further acknowledge that if I have difficulty reading or understanding any of the provisions of the manual, that I am to contact the Human Resources Department for assistance.
The Handbook contains many extensive and detailed policies and practices in effect at Wakefield. It also contained the statement that “[t]he policies and procedures that are contained in this manual are not terms and conditions of your employment nor a contract, and the manual itself is not a contract or an offer to enter a contract.” Further, the Handbook provides that no employee is hired for a specific term, upon any specific conditions or pursuant to any contract of employment, and that the Company has the corresponding right to terminate any employee at any time with or without notice or cause.
Prior to the incident involved, Ortega never had any problems, employment or otherwise, with his employer. He was a hard worker who worked 55 to 60 hours per week for his employer, and basically did what was asked of him by his employer.
The incident that triggered his termination was a vacation by Ortega to the Dominican Republic to visit family. He submitted a vacation request for April 8,2002 through April 22, 2002, and planned on returning to work on April 23, 2002. On Saturday, April 6, 2002 he flew to the Dominican Republic. Ortega had a plane ticket for a return flight on Monday, April 22, 2002, but was not allowed to board the plane. Evidently, Ortega arrived about thirty (30) minutes before the flight was scheduled to depart and American Airlines personnel informed him that they had already sold his seat, and that there were no further seats available on the flight. Ortega stated that he made inquiries of the American Airlines personnel, but was informed that there were no other flights that day and that the next available flight was Thursday, April 25, 2002. Ortega states that he telephoned his supervisor, Tony Escobar (“Escobar”) and told him that he could not make it back to work because he missed his flight and that there were no seats to Boston available until Thursday. Escobar did not indicate that Ortega’s absence would create any problem for the company and indicated that Wakefield would continue to use supervisors to fill in for him. On Thursday, April 25,2002, Ortega flew out of the Dominican Republic and on Friday April 26, 2002 returned to work. He was three days late in returning to work.
After he had been working for approximately one hour, Escobar came over to Ortega and brought Ortega to the Human Resources Manager, Maiy Michaud (“Michaud”). After getting the necessary permissions, Wakefield, by Michaud, fired Ortega on the spot. Michaud stated that she called a travel agent in New Hampshire and was informed that there were seats available on American Airlines flights prior to Thurs *338 day, April 25, 2005, from the Dominican Republic to Boston. It was stated that Ortega was not fired for being late to return to work, but was fired for being dishonest to his employer.[2]

Discussion

In a motion for summary judgment, the moving party bears the burden of showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). The burden need not be met with affirmative evidence negating an essential element of the plaintiffs case, but it may be satisfied by demonstrating that proof of the element is unlikely to be forthcoming at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711-12 (1991). In ruling on the motion, the judge should consider the evidence “with an indulgence in the [opposing party’s] favor.” Anthony’s Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc., 396 Mass. 818, 822 (1986). The judge should not weigh the credibiliiy of any evidence. “A toehold... is enough to survive a motion for summary judgment.” Marr Equipment Corp. v. I.T.O. Corp. of New England, 14 Mass.App.Ct. 231, 235 (1982).
In opposition to the motion for summary judgment, the plaintiff points to Handbook policy “S3" which concerns disciplinary action and indicates "generally" that “the employee will be given advance notice that there is a serious problem with his performance, which may necessitate termination of employment at a future date.” The objective of this advance notice is to give the employee a reasonable opportunity to alter his conduct or performance so as to salvage his employment with the Company. Furthermore, there are “Progressive Discipline” procedures in which an employee is subject to a verbal warning, a written warning, a three-day suspension, and termination. See Handbook Sections 3.0 to 3.5 (Disciplinary Action Policy).
Here, Wakefield gave Ortega no warning. They simply fired him about one hour after he arrived at work on Friday, April 26, 2005. Wakefield did not give this employee of twenty-two (22) years any progressive discipline as described in the Handbook. He was allegedly fired, without a hearing, based on the representations of a travel agent in New Hampshire.
The Employee Handbook states in part that it is not to be considered a contract, expressed or implied, between Ortega and Wakefield. Wakefield conspicuously states throughout the manual that it is not a contract and Wakefield reserves the right to change or eliminate its policies and procedures as necessary and without having to consult with or obtain the agreement of the employee.
In Massachusetts, “employment at will is terminable by either the employee or the employer without notice, for almost any reason or for no reason.” Jackson v. Action for Boston Community Development, Inc., 403 Mass. 8, 9(1988). Here, Ortega is alleging that the defendant employer issued the Wakefield Engineering Employee Handbook to each employee of the company and that promises concerning disciplinary procedures made in this manual are binding on the employer.
“The principle that promises made in a personnel manual may be binding on an employer is accepted in a clear majority of American jurisdictions . .. The idea that an employer may ignore promises made in a personnel manual is in increasing disfavor in this country.” O’Brien v. New England Telephone & Telephone Co., 422 Mass. 686, 691 (1996). The key inquiry is whether in light of the context of the manual’s preparation and distribution, as well as its specific provisions, it would be objectively reasonable for employees to regard the manual as a legally enforceable commitment concerning the terms and conditions of employment. O’Brien, 422 Mass. at 694; Weber v. Teamwork Inc., 434 Mass. 761, 779-80 (2001) (“Where an employee signs a personnel policy ... or where an employer calls special attention to the policy, a finding that the terms of the policy form the basis of an implied contract may be justified”); Ferguson v. Host International, Inc., 53 Mass.App.Ct. 96, 102 (2001). Negotiation of the terms of the contract between the employer and the employee is not an essential precondition to enforcement of the manual. O’Brien, 422 Mass. at 692. Further, any disclaimer clauses stating that a manual creates no contractual rights or reserving a unilateral right to modify or cancel the manual, while relevant, are not dispositive of whether an employee could reasonably believe that the procedures contained therein bind management. O’Brien, 422 Mass. at 693; Ferguson, 53 Mass.App.Ct. at 102-03.
If read as the manual sets out, an employee is informed of his rights and benefits in the policy manual, including the policy of progressive discipline (as set out in explicit detail in the five-page policy entitled Disciplinary Action, Policy No. S3), and then tells the employee, in essence, that by the way, you have no rights under this policy manual or under policy “S3" unless we, that is the employer, agrees at the time of your problem, that you have any rights at all. Wake-field always has the right to ignore the policy, with or without cause and with or without notice, but the employee does not. Defacto, the Employee Handbook does not give the employee any rights, unless the Company agrees in its benevolence to give them. The privileges and rights given to its employees in the Handbook are totally illusionary. A juiy could find that the manual is deceptively written by the employer, informing the employee that he has rights, but only if the Company agrees to give them to an employee at the time that he needs these rights. The contract coúld be considered by the jury to have been fraudulently written for the sole interest, financial or otherwise, of the employer. The manual does not set out the circumstances and conditions when an employer may disregard the Disciplinary Action policy and its progressive *339 discipline procedures, but allows it to do whatever it wants to do. Contrast: Webber v. Community Teamwork, Inc., 434 Mass. 761, 779 n.36 (2001), when the employer specifically stated in the employee handbook when and for what reasons an employee may be terminated without going through its ’’progressive disciplinary procedures."
Further, the jury could find that Ortega relied on the employee manual and its policies as a condition of his continuing employment at Wakefield. This issue is discussed in both O’Brien, 422 Mass. at 692, and Weber, 434 Mass. at 780 (“Where an employee signs a personnel policy or where an employer calls special attention to the policy, a finding that the terms of the policy form the basis of an implied contract may be justified”). Here, there is evidence that Ortega signed the Corporate Policy Manual Acknowledgment on May 8, 2001, and therefore agreed, at least implicitly, that the Manual set out the Company’s general personnel policies and about Ortega’s privileges and obligations as an employee. He specifically knew of the progressive discipline provision of Policy S3. The fact that Ortega received the manual and signed an acknowledgment of its receipt may constitute sufficient evidence that there was an implied contract. O’Brien, 422 Mass. at 693. The juiy could find that Ortega relied on the Manual and in particular on Policy S3 regarding progressive discipline, which he read and discussed with his fellow employees. After his receipt of the manual, he continued to work under provisions that would be in the nature of the acceptance of an offer of a unilateral contract. O’Brien, 422 Mass. at 693.
The question of the extent to which an employer may effectively reserve his rights to change or withdraw a manual, or some part of it, or the extent to which management may successfully provide that the manual from its inception or by amendment creates no rights at all is discussed in cases throughout the country. O’Brien, 422 Mass. at 694. However, before considering this point, it should be noted as discussed above, that any disclaimer clauses stating that the employer creates no contracted rights or reserves a unilateral right to modify or cancel the manual is not dispositive of whether the employee could reasonably believe that the procedures contained therein bind management. O’Brien, 422 Mass. at 692-93.
There are many cases around the country that deal with this issue. There is also a key law review article captioned Employee Handbooks and the Legal Effect of Disclaimers by Stephen F. Befort, Professor of Law at the University of Minnesota and cited as 13 Industrial Rel.L.J. 326 (1993). In 1993, no fewer than 45 reported decisions over this past decade have declined to give effect to handbook disclaimers. Id. at 21, ni.#282 and Appendix infra at 382. This article describes situations where the employer sets out the privileges and benefits due an employee and then allow the employer, unilaterally and at will, to disclaim all those benefits. It is one thing to permit an employer to reap the benefits of a handbook by making explicit representations of job protections or job securify, but quite another thing to allow the employer to avoid complying with these representations of job security or other rights, merely by including a disclaimer. As observed in a number of recent opinions, the situation becomes the quintessence of having “one’s cake and eating it too.” The following cases from around the country have addressed the issue:
Jones v. Central Peninsula General Hospital 779 P.2d 783, 788 (Alaska, 1989) (The manual therefore creates the impression, contrary to the “disclaimer,” that employees are to be provided with certain job protections. Employers should not be allowed to instill... reasonable expectations of job securify in employees, and then withdraw the basis of those expectations when the employee’s performance is no longer desired).
Thompson v. King’s Entertainment Co., 674 F.Sup. 1194, 1198 (ED.Va. 1987) (employers should be bound by therein expressed policies to preclude therein offering with one hand and then taking away with the other).
Eldridge vs. Evangelical Lutheran Good Samaritan Society, 417 N.W.2d 797, 801 (M.D. 1987) (“There are evident issues of fact about ambiguity and relevance created by an employer’s disclaimer in an employee handbook that purports to ’taketh’ what the remainder of the handbook appears to give”).
See also: Matthew W. Finkin, The Bureaucratization of Work: Employer Policies and Contract Law, 1986 Wis.L.Rev. 733, 751-52 (1986) (stating that judicial enforcement of a boiler plate disclaimer “comes to deference to a fraud”).
Comment, Unilateral Modification of Employment Handbooks: Further Encroachments on the Employment-at-Will Doctrine, 139 U.Pa.L.Rev. 197, 208-09 n. 76 (1990) (citing cases from thirty-three states and District of Columbia).
In O’Brien, 422 Mass. at 694, the Court, by Judge Wilkins, perhaps summed up best the reasons why in a case like this, a company policy manual may be considered as a binding commitment, legally enforceable concerning the terms and conditions of Ortega’s employment.
Management distributes personnel manuals because it is thought to be in its best interests to do so. Such a practice encourages employee securify, satisfaction, and loyalty and a sense that every employee will be treated fairly and equally. See Toussaint v. Blue Cross & Blue Shield of Mich., 408, 579, 613, 292 N.W.2d 880 (1980). Management expects that employees will adhere to the obligations that the manual sets forth. Courts recently have been reluctant to permit management to reap the benefits of a personnel manual and at the same *340 time avoid promises freely made in the manual that employees reasonably believed were part of their arrangement with the employer. Management voluntarily offers, and defines the terms of, any benefit set forth in its unbargained for personnel manual. The employees may have a reasonable expectancy that management will adhere to a manual’s provisions. “Without minimizing the importance of its specific provisions, the context of the manual’s preparation and distribution is, to us, the most persuasive proof that it would be almost inevitable for an employee to regard it as a binding commitment, legally enforceable, concerning the terms and conditions of his employment.” Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 299, 491 A.2d 1257, modified on other grounds, 101 N.J. 10, 499 A.2d 515 (1985). In the circumstances of this case, an affected employee’s reliance on the manual would be reasonable, and O’Brien, as one of those employees, is entitled to whatever rights that the manual sets forth.
In conclusion, this court believes that there are genuine issues of material fact in dispute and therefore, the motion for summary judgment should be denied. At best for Wakefield, it might be a “close case.” In any respect, the case should be tried, and depending on the jury verdict the Court may reconsider these issues on Motion JNOV. In that way, there will be only one trial and, if indicated, one appeal.

ORDER

After hearing and review of all submission, the defendant’s Motion for Summary Judgment is DENIED as there are genuine issues of material fact in dispute.

 The acknowledgment signed by Ortega on May 8, 2001, states in part:
1. That Ortega received the manual.
2. That the Manual contains important information about the Company’s general personnel policies and about his privileges and obligation as an employee.
3. That he was expected to read, understand and adhere to the employer’s policies and to familiarize himself with the material in the Corporate Manual.

 The Court notes that Ortega applied for unemployment benefits with the State of New Hampshire. Wakefield opposed and contested the unemployment claim contending that the plaintiff was discharged for misconduct in connection with his work. At the hearing before the New Hampshire Security Appeal Tribunal, Wakefield contended that “[Ortega! was discharged because he was a supervisor. He set a poor example for his subordinates by not returning from vacation timely and the employer was fearful that others would do the same.” Notwithstanding its statement at the time Ortega was fired, nothing was represented to the Appeal Tribunal by Wakefield that Ortega was in any way dishonest. There was no conversation by Wakefield with the claimant about the incident prior to his discharge. After a hearing, the Appeal Tribunal concluded that “after a review of all the records and all the testimony... the claimant was discharged but not for misconduct connected with his work.” In reaching this conclusion, the tribunal chairman found that there was no pattern of negligence or disregard for the employer’s best interest. Further, given Ortega’s length of employment and the employer’s failure to advise Ortega that his absence was a problem, the single incident was not severe to such a degree as to be considered misconduct. Wakefield did not appeal this decision or findings.