USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 ____________________

No. 97-1126

 MICHAEL LOUIS BRENNAN,

 Plaintiff - Appellant,

 v.

 PAUL KING, ET AL.,

 Defendants - Appellees.

 ____________________

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Richard G. Stearns, U.S. District Judge]

 ____________________

 Before

 Boudin, Circuit Judge,

Hill, Senior Circuit Judge,

and Pollak, Senior District Judge.

 _____________________

 Edward Greer, was on brief for appellant.
 Marc Redlich, with whom Steven T. Sager, Merle Ruth Hass and
Law Offices of Marc Redlich, were on brief for appellees.

 ____________________

 March 20, 1998
 ____________________ POLLAK, District Judge. This case involves the extent of
an employee's obligation to pursue contractual grievance procedures
prior to--or in lieu of--bringing suit. Plaintiff-appellant
Michael Louis Brennan, a faculty member at Northeastern University,
brought suit in federal court in Massachusetts against
Northeastern, its trustees, president, and provost, the dean of
Northeastern's College of Engineering, and the acting chair of the
university's Department of Industrial Engineering and Information
Systems. Brennan alleged, inter alia, that defendants violated
federal and state anti-discrimination laws and breached his
contract of employment with Northeastern. More specifically,
Brennan contended that, as a tenure-track assistant professor, he
was eligible for promotion to tenure rank but was denied tenure
because he was gay and HIV-positive. 
 The district court granted defendants' motion for summary
judgment on the ground that Brennan had failed to pursue the
grievance procedure governing adverse tenure decisions which was
set out in the employee handbook and thereby incorporated into
Brennan's employment contract. Brennan then brought this appeal. 
Brennan acknowledges that he did not invoke the specified grievance
procedure, but he argues that the grievance procedure he bypassed
was not a remedy he was bound to invoke before presenting his
claims to a federal court. With respect to Brennan's federal
claims and the bulk of his state claims, we agree and, accordingly,
reverse in part. With respect to Brennan's claims of breach of
contract, we hold that Massachusetts law required resort to
contractual remedies before suit. We will therefore affirm on that
issue. 
I. Facts
 The principal facts relevant to this appeal are not in
dispute. In 1988, appellant Brennan joined the Northeastern
faculty as a tenure-track assistant professor of industrial
engineering. During the 1993-94 academic year, he applied for
tenure and was turned down. Because the university has a policy
that limits non-tenured assistant professors to six years of
employment, Brennan was given a final contract for the 1994-95
academic year, after which his employment was terminated. 
Brennan's employment contract for 1993-94 expressly incorporated
the terms of the Northeastern University Faculty Handbook for that
year. The handbook sets out (1) a general grievance procedure,
which includes the possibility of "binding arbitration," and (2) a
separate grievance procedure, governing tenure appeals, which
includes a form of arbitration characterized as "binding" but of
limited scope.
 A. Northeastern's Tenure Review and Appeals Procedures
 Tenure Review

 Tenure review at Northeastern is a multi-step process
ultimately leading to a decision by the board of trustees.
Initially, the candidate's record is reviewed by at least three
tenured members of his or her department. This review leads to a
departmental recommendation that is transmitted to the dean of the
college. The dean, in turn, makes a recommendation to the provost
of the university. The provost then makes a recommendation to the
university president. In the last stage of the process, the
president makes a recommendation to the board of trustees, and the
board then makes a final decision. At no stage of the procedure is
the recommendation of any evaluator binding upon the evaluator or
decision-maker at the next stage.
 Tenure Appeals. The tenure appeals process is made
available following a decision by the provost to recommend to the
president that the candidate's tenure application be denied. 
 The precise course of the tenure appeals process varies
depending on whether the appellant makes a claim of, or including,
"discriminatory acts" in connection with an adverse tenure
recommendation. If a tenure candidate's appeal does not involve a
"formal claim of discriminatory acts," the candidate must bring his
or her appeal before the University Standing Appeals Committee on
Tenure ("the Appeals Committee" or "Committee") within five days
after the candidate learns of the provost's adverse decision. The
Appeals Committee is composed of tenured faculty members from
various schools of the university. Upon concluding its inquiry,
the Committee makes a recommendation to the provost. If the
Committee recommends in favor of the candidate, but the provost
continues to maintain that tenure should be denied, the handbook
authorizes the candidate "to submit procedural issues to binding
arbitration" within ten days of learning of the provost's decision
to proceed with the negative recommendation. The handbook
specifies that "[t]he decision of the arbitrator, within the scope
of his or her jurisdiction, shall be final and binding on the
parties to the dispute and the University; however, the arbitrator
shall be without power to . . . (3) substitute his or her judgment
on the professional qualification of a faculty member for the
judgment of any academic committee or official, or (4) engage in a
comparative review of the candidate's merits with those of other
candidates, or (5) grant or deny tenure."
 If the arbitrator "is convinced that the Provost's
decision is not reasonably supported by the record," the arbitrator
can require the provost to transmit to the president the Appeals
Committee's positive recommendation instead of the provost's
negative one. As with all tenure evaluations received from the
provost, the president is not bound by such a recommendation.
 Although the foregoing procedures generally govern the
Appeals Committee's consideration of a tenure decision, the
handbook provides a candidate with a different initial procedural
route if his or her appeal presents, or includes, issues of
discrimination. The manual instructs that a tenure candidate who
believes that he or she has been subject to discrimination "should
consult with" the university's Office of Affirmative Action
("OAA"). In the event that a candidate institutes a tenure appeal,
and the appeal involves "formal claim[s] of discriminatory acts,"
the handbook directs that the candidate present those claims to the
OAA before the candidate's case will be considered by the Appeals
Committee. The Appeals Committee will stay any issues not
involving discrimination while the OAA conducts an investigation
and makes findings. If the OAA finds "Reasonable Cause"--that is,
facts supporting the claim of discrimination--it will transmit this
finding to the Appeals Committee, which will then consider the
appeal. (What weight this finding is to be given by the Appeals
Committee is left entirely unclear). If, on the other hand, the
OAA does not find "Reasonable Cause," the Appeals Committee is to
dismiss the discrimination issues and proceed to examine issues
that do not relate to discrimination (if any). Thus, so long as
any issues remain after the OAA makes its finding, the appeals
process runs its course whether that finding is one of "Reasonable
Cause" or not; as explained above, the appeals process includes the
candidate's option to request arbitration if: (1) the Appeals
Committee makes a recommendation favorable to the candidate, and
(2) the provost nonetheless states an intention to adhere to the
original unfavorable recommendation.
 
 B. The Course of Events in Brennan's Case
 Although Brennan received positive recommendations at the
departmental and decanal levels of review, the provost informed
Brennan that he intended to recommend against the granting of
tenure. Brennan, apparently on the advice of counsel, eschewed the
university's tenure appeal process altogether. That is to say,
Brennan did not present his case to the Office of Affirmative
Action or to the Appeals Committee. (Not having sought Appeals
Committee review, Brennan could not have elected to present his
case to arbitration had he wished to do so). Accordingly, the
provost transmitted his negative recommendation to the president. 
The president in turn submitted a negative recommendation to the
board of trustees, and that body made the final decision to deny
tenure.
 Having been turned down at the highest level of
university decision-making, Brennan filed complaints with the
Massachusetts Commission Against Discrimination ("MCAD") and the
federal Equal Employment Opportunity Commission ("EEOC"). The MCAD
issued a "Lack of Probable Cause Finding," a decision that it
affirmed on administrative appeal. The EEOC also found no
violation, and issued a right-to-sue letter.
 Brennan then commenced this suit in the District Court
for the District of Massachusetts, alleging violation of the
Americans with Disabilities Act (ADA), 42 U.S.C. 12101 et seq.,
and the Rehabilitation Act of 1973, 29 U.S.C. 794 et seq., as
well as several state-law claims, including breach of contract and
violation of anti-discrimination provisions of the Massachusetts
Constitution and Massachusetts statutes. The parties agree that
all of Brennan's claims stem from his contention that he was denied
tenure because of his sexual orientation and his HIV-positive
status.
 Northeastern and its officials moved for dismissal or
summary judgment on the ground that Brennan had failed to pursue
the grievance procedure specified in his employment contract. The
district court entered summary judgment in favor of the university
and its fellow defendants, giving particular weight to the
"[f]ederal policy favor[ing] arbitration agreements." Memorandum
and Order on Defendant's Motion to Dismiss, Brennan v. King, No.
96-11526, at 2 (D. Mass. Dec. 13, 1996). "[P]laintiff's contract,"
the court held, "clearly commits tenure disputes to the
University's grievance and arbitration process." Id. 
 The district court had federal question jurisdiction by
virtue of appellant's ADA and Rehabilitation Act claims. 28 U.S.C.
 1331. The district court also had supplemental jurisdiction over
appellant's state-law claims because they arise from the same
operative facts. 28 U.S.C. 1367(a). Because this is an appeal
from entry of summary judgment, our review is de novo. To the
extent that any factual issues remain, we must resolve all such
questions in the way most favorable to the non-moving party. SeeByrd v. Ronayne, 61 F.3d 1026, 1030 (1st Cir. 1995). 
II. Discussion
 In bringing this lawsuit, Brennan has undertaken to place
in issue the question whether Northeastern University was justified
in denying him tenure, or whether, as Brennan asserts, the denial
of tenure was based upon unacceptable grounds--namely that Brennan
was gay and HIV-positive. But the district court, in granting
summary judgment in favor of the appellees, did not address the
merits of Brennan's claims. Rather, the district court concluded
that Brennan was barred from coming to court because he had not
traveled the entire path of the grievance procedure which, pursuant
to Brennan's contract of employment with Northeastern, was
available to him. In particular, the district court, noting the
strong federal policy favoring arbitration, faulted Brennan for
pretermitting the arbitration aspect of the grievance procedure. 
 Brennan contends that the district court erred in its
ruling on the arbitration issue. Brennan also argues that
appellees have waived their arbitration defenses by not raising
them in the EEOC and MCAD proceedings. For their part, appellees
urge what appear to be two distinct grounds in support of
affirmance: (1) both federal and state arbitration law required
that Brennan arbitrate his claims, and (2) some species of
exhaustion doctrine required that Brennan utilize the university's
grievance process before resorting to court. 
 We first address Brennan's waiver arguments. We then
consider the principal questions in this case--whether the Federal
Arbitration Act, or its Massachusetts counterpart, or exhaustion
doctrine more broadly construed--required Brennan to pursue the
grievance procedure, including arbitration, described in his
contract of employment. Finally, we turn to the question whether
Brennan was required by Massachusetts common law to pursue the
contractual grievance procedure before suing for breach of
contract.
 A. Waiver
 As a preliminary matter, we address Brennan's argument
that appellees waived their arbitration defenses because appellees
failed to raise them in the administrative proceedings before the
EEOC and the MCAD. The district court rejected this argument,
finding that "the University counsel's . . . letter to the MCAD
. . . discusses this failure at great length." Memorandum and
Order on Defendant's Motion to Dismiss, at 2 n.2. In fact, the
university's letter to the MCAD does mention, in at least two
places, the fact that Brennan did not exhaust the university's
grievance procedure prior to presenting his claim to the MCAD.
Brennan, however, urges that appellees' mere mention of the fact
that he had not exhausted the procedure does not amount to raising
the issue as a defense, and that it is the failure to raise the
defense that constitutes waiver in this case. Brennan contends
that, having failed to characterize the issue as a matter of
defense at the administrative agency level, appellees have
forfeited their entitlement to raise the issue before the district
court.
 It is, of course, true that a court charged with
reviewing determinations of another tribunal will not ordinarily
consider issues not raised in the earlier proceedings. But that
truism is without application here since it was no part of the
responsibility of the district court to review the determinations
of the EEOC or the MCAD. Nor was it appellees' responsibility to
raise arbitration as a defense in the administrative proceedings. 
Appellees' arbitration arguments do not constitute relevant
defenses before the EEOC. As the Supreme Court recently noted, "An
individual . . . claimant subject to an arbitration agreement will
still be free to file a charge with the EEOC, even though the
claimant is not able to institute a private judicial action." 
Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 28 (1991). 
We see no reason to suppose that the Massachusetts courts would
treat Brennan's state-law discrimination claims differently. 
Therefore, we do not find that appellees waived their arbitration
defenses by their failure--if failure there was--to raise before
either of the administrative agencies contentions that would not
have been pertinent defenses in such a forum. 
 Nor can it be said that appellees have advertently chosen
to withhold their arbitration defenses during litigation in such a
way that Brennan is prejudiced by the delay. We have found
arbitration defenses waived when a party sought to take advantage
of an arbitration clause by raising the issue as a defense late in
the litigation. See, e.g., Menorah Ins. Co. v. INX Reinsurance
Corp., 72 F.3d 218, 221 (1st Cir. 1995)(finding waiver where
arbitration was raised as defense to suit after a year of
litigation); Caribbean Insurance Services, Inc. v. American Bankers
Life Assurance Co., 715 F.2d 17, 19 (1st Cir. 1983) (finding waiver
where party asserted arbitration as defense six months after being
sued); Jones Motor Co. v. Chauffeurs, Teamsters and Helpers Local
Union No. 633, 671 F.2d 38, 43 (1st Cir.) ("[T]o require that
parties go to arbitration despite their having advanced so far in
court proceedings before seeking arbitration would often be unfair,
for it would effectively allow a party sensing an adverse court
decision a second chance in another forum."), cert. denied, 459
U.S. 943 (1982). Appellees in this case, however, promptly raised
their defenses in the district court, and it is to judicial, rather
than administrative, proceedings that we look to determine whether
such waiver has occurred. See Sevinor v. Merrill Lynch, Pierce,
Fenner & Smith, Inc., 807 F.2d 16, 18 (1st Cir. 1986) (finding no
waiver where defendants promptly raised arbitration as a defense to
a suit). Accordingly, the district court did not err by
considering the arbitration arguments advanced by Northeastern and
its officials, and we therefore will entertain those arguments.
 B. Enforceability of the Handbook's Arbitration Provision
 We first consider whether the Federal Arbitration Act
(FAA) obligated Brennan to arbitrate his claims against
Northeastern. As we have had occasion to observe, "a party
seeking to substitute an arbitral forum for a judicial forum must
show, at a bare minimum, that the protagonists have agreed to
arbitrate some claims." McCarthy v. Azure, 22 F.3d 351, 354-55
(1st Cir. 1994). This much appellees have shown. The
university's faculty handbook describes a "regular grievance
procedure" committing issues other than tenure decisions to binding
arbitration and a separate process for submitting to binding
arbitration "procedural issues" relating to tenure review. 
Therefore, we apply FAA principles to this dispute.
 Having determined that the FAA is here implicated, we
consider whether the dispute between Brennan and Northeastern that
is the focus of this lawsuit is the sort of dispute that the
parties agreed to arbitrate. Although this is fundamentally an
issue of contract interpretation--for which state law provides the
basic interpretive rules--our inquiry is informed by FAA
jurisprudence. In FAA cases, Supreme Court precedents "instruct
courts to use a particular hermeneutic principle for interpreting
the breadth of the agreement," viz., the presumption of
arbitrability. McCarthy, 22 F.3d at 355. This presumption
dictates that "as a matter of federal law, any doubts concerning
the scope of arbitrable issues should be resolved in favor of
arbitration, whether the problem at hand is the construction of the
contract language itself or an allegation of waiver, delay, or a
like defense to arbitrability." Moses H. Cone Memorial Hospital v.
Mercury Construction Corp., 460 U.S. 1, 24 (1983). Accordingly,
"in applying general state-law principles of contract
interpretation to the interpretation of an arbitration agreement
within the scope of the Act, due regard must be given to the
federal policy favoring arbitration, and ambiguities as to the
scope of the arbitration clause itself resolved in favor of
arbitration." Volt Information Sciences, Inc. v. Leland Stanford
Junior University, 489 U.S. 468, 475-76 (1989) (citation omitted).
 The presumption of arbitrability is a weighty additive to
state-law principles of contract construction, but it does not
wholly supplant these principles. As with other issues involving
the construction of individual employment contracts, in determining
whether a contract requires arbitration, "courts generally . . .
should apply ordinary state-law principles that govern the
formation of contracts." First Options of Chicago, Inc. v. Kaplan, 
514 U.S. 938, 944 (1995). At bottom, arbitration remains "simply
a matter of contract between the parties; it is a way to resolve
those disputes--but only those disputes--that the parties have
agreed to submit to arbitration." Id. at 943. 
 We turn, therefore, to the application of these
principles. As the parties agree, Brennan's claims, though they
are expressed as manifold causes of action, all concern the
university's denial of tenure to Brennan. We therefore look to the
contract to determine whether the parties have agreed to submit
tenure decisions to arbitration, resolving any doubts arising from
this interpretive enterprise in favor of arbitration. 
 As we have previously noted, Brennan's contract with
Northeastern contains two arbitration provisions. For non-tenure
related grievances, the handbook establishes a grievance system
potentially culminating in binding arbitration. This general
grievance scheme contemplates a comparatively broad arbitral
authority for the resolution of faculty complaints of unfair or
inequitable treatment or of misapplication of the handbook or other
governing documents or regulations. 
 The grievance procedure with respect to tenure disputes
is wholly separate and evinces no broad arbitral authority to
resolve such disputes. The handbook does allow for a proceeding
within the tenure consideration process labeled "binding
arbitration." But it is readily apparent that such arbitration as
the handbook contemplates could not have resolved Brennan's dispute
with the university. To be sure, the handbook recites that an
arbitral decision "shall be final and binding on the parties to the
dispute and the University." But the scope of what is subject to
arbitration is limited to "procedural issues." Although it is not
at all clear what is embraced under the rubric of "procedural
issues," it is abundantly clear that among those things that the
arbitrator is "without power to" do is to "grant or deny tenure." 
Evidently the arbitrator is confined to addressing non-substantive
issues that may--but also may not--have some impact on the tenure
decision ultimately made by the university's trustees. 
 Furthermore, to the extent that the arbitrator can be
said to have authority to "bind" the parties, including the
university, with respect to "procedural issues," the narrowness of
that authority is plain to see. In what would be, for the
university, the worst-case scenario--one in which the arbitrator
"is convinced that the Provost's decision [to transmit to the
president a negative tenure recommendation notwithstanding the
Appeals Committee's positive recommendation] is not reasonably
supported by the record," all the arbitrator is empowered to do is
require the "Provost to transmit, to the President, the Standing
Appeals Committee's positive recommendation in lieu of the
Provost's own." And both the president and the board of trustees
remain entirely free to disregard the favorable Appeals Committee
recommendation forwarded by the provost pursuant to the
arbitrator's directive. Consequently, the president will still
receive nothing more than a recommendation, not a conclusive
determination. Thus the most that a tenure candidate can achieve
through arbitration is the substitution of the Appeals Committee's
positive recommendation for the provost's negative recommendation.
 Nor does the contract manifest an intent that arbitration
be the exclusive means for addressing a dispute over tenure. The
handbook speaks only of the candidate having a "right" to request
arbitration. It is true that there is authority for the
proposition that in some circumstances courts have the power to
enforce agreements that require arbitration even when such
arbitration is nonbinding. See AMF, Inc. v. Brunswick Corp., 621
F. Supp. 456, 461 (E.D.N.Y. 1985) (Weinstein, J.) (holding an
agreement requiring nonbinding arbitration enforceable under the
FAA when there is a "reasonable . . . expectation [that] the
dispute will be settled" by the procedure). In this case, however,
the parties have made resort to arbitration the prerogative, but
not the obligation, of the tenure candidate. 
 Northeastern's arbitral procedure does not, therefore,
provide a forum for the entire resolution of a tenure candidate's
dispute with Northeastern. It merely serves to provide a formal
setting in which a candidate may seek reconsideration, on
circumscribed "procedural" grounds, of a provost's negative
recommendation. Viewed closely, then, the arbitral procedure turns
out to be an option that a candidate may invoke or not as he or she
chooses--an option which, if invoked, has a very limited horizon. 
It cannot be said that the employment contract crafted by
Northeastern is one under which both the university and Brennan
have committed themselves to arbitrate disputes about tenure. 
Northeastern appears to have agreed that it would participate in a
narrowly confined form of arbitral process had Brennan chosen to
invoke the process. But Brennan had no duty to make that choice. 
Therefore the presumption of arbitrability is overcome by the terms
of the contract.
 We have concluded that the Federal Arbitration Act did
not require Brennan to invoke the arbitral aspect of Northeastern's
grievance system. We now turn to the question whether the
Massachusetts Arbitration Act would call for a different result. 
We conclude that it does not. The Massachusetts Arbitration Act,
Mass. Gen. Laws ch. 251 1 et seq. adopts the Uniform Arbitration
Act, and its relevant language closely tracks that of the federal
statute. The Massachusetts courts have interpreted this statute,
as it relates to the scope of the agreement to arbitrate, in
conformity with (and sometimes with reference to) federal
authority. See, e.g., Unisys Finance Corp. v. Allan R. Hackel
Org., Inc., 676 N.E.2d 486, 489 (Mass. App. Ct. 1996); Town of
Danvers v. Wexler Construction Co., Inc., 422 N.E.2d 782, 784
(Mass. App. Ct. 1981). Hence under Massachusetts arbitration law,
we find a similar presumption of arbitrability, which can similarly
be overcome by a showing that the particular dispute at issue is
not subject to arbitration by the terms of the agreement. SeeUnisys, 676 N.E.2d at 489 (quoting Hurlbut v. Gantshar, 674 F.
Supp. 385, 390 (D. Mass. 1987)("In the absence of an actual
agreement to arbitrate a particular dispute or class of disputes,
the Court cannot compel arbitration.")). Therefore, for the
reasons set forth above, we conclude that the Massachusetts
Arbitration Act did not require Brennan to arbitrate this dispute.
 C. Exhaustion
 Appellees also raise arguments that can be characterized
as invoking exhaustion principles. Although neither appellees'
brief nor appellant's brief separates the possible ingredients of
the concept of "exhaustion," we think that, for the purposes of
coherent analysis, certain distinctions must be drawn. First,
appellees may be understood to be invoking familiar concepts of
exhaustion of administrative remedies. Alternatively (or
additionally), they may be regarded as arguing that some source of
law requires exhaustion of possible contractual remedies before
bringing suit. We will discuss each of these possibilities. As it
relates to Brennan's breach-of-contract claim, the contractual
exhaustion issue merits independent consideration under state law
and will accordingly be addressed separately below. 
 1. Brennan's Statutory and Constitutional Claims
 We first consider Brennan's claims alleging violation of
federal and state anti-discrimination laws. Brennan has alleged
violations of the Americans with Disabilities Act, 42 U.S.C.
 12101 et seq., the Rehabilitation Act, 29 U.S.C. 794 et seq.,
and several Massachusetts anti-discrimination provisions, Mass.
Const. art. 114 (prohibiting discrimination against handicapped
persons); Mass. Gen. Laws ch. 151B, 4 (1), (16) (prohibiting
employment discrimination on the bases of sexual orientation and
disability); Mass. Gen. Laws ch. 93, 103(a) (Massachusetts Equal
Rights Act). 
 It is true that Brennan's claims under the ADA and under
the Massachusetts anti-discrimination statutes are subject to the
exhaustion doctrine, which requires a claimant to pursue
administrative remedies before filing suit. Brennan, however,
fully pursued his discrimination claims with both the EEOC and the
MCAD. Appellees have not suggested that Brennan's pursuit of
administrative remedies was in any way inadequate to fulfill the
exhaustion requirements that obtain.
 Appellees have, however, also sought to invoke the
exhaustion doctrine in order to require Brennan to exhaust
potential contractual remedies. With respect to Brennan's federal
and state civil rights claims, we find no ground to require this
type of exhaustion. The federal statutes and the Massachusetts
constitutional and statutory provisions invoked by Brennan reveal
no indication that potential contractual avenues of relief must be
pursued prior to suit. Furthermore, appellees have not cited, and
we have not found, any cases suggesting that such a requirement
inheres in the relevant federal or state provisions. 
 Appellees point out that the Supreme Court has required
union members who have a grievance under a collective bargaining
agreement to invoke the grievance and arbitration machinery
established by that contract before resort to court. See Republic
Steel v. Maddox, 379 U.S. 650, 652 (1965); Vaca v. Sipes, 386 U.S.
171, 184 (1967). Stated another way, in the collective bargaining
context, there is a requirement that union members exhaust
available contractual remedies before bringing suit. True as this
is, it has no relevance to Brennan's federal and state statutory
claims or his state constitutional claims. The record does not
suggest that Brennan is a member of a bargaining unit covered by a
collective bargaining agreement. Appellees have pointed to no
cases, nor have we found any, that extend the contractual
exhaustion doctrine from federal labor law into the individual
employment setting to bar litigation of statutory or constitutional
civil rights claims. 
 To the extent that appellees' argument may be understood
to invite us to make such an extension, we are unpersuaded. 
Arbitration--as part of a contractual grievance procedure--is
granted an especially privileged position in labor law because it
is considered integral to the bargaining process and serves to
avoid industrial conflict: 

 In the commercial case, arbitration is the
 substitute for litigation. Here arbitration
 is the substitute for industrial strife. . . . 
 [Arbitration of labor disputes under
 collective bargaining agreements] is part and
 parcel of the collective bargaining process
 itself. 
 
 The collective bargaining agreement states
 the rights and duties of the parties. It is
 more than a contract; it is a generalized
 code to govern a myriad of cases which the
 draftsmen cannot wholly anticipate. The
 collective bargaining agreement covers the
 whole employment relationship. 

 . . . Arbitration is the means of solving
 the unforeseeable by molding a system of
 private law for all the problems which may
 arise and to provide for their solution in a
 way which will generally accord with the
 variant needs and desires of the parties. The
 processing of disputes through the grievance
 machinery is actually a vehicle by which
 meaning and content are given to the
 collective bargaining agreement. 

 . . . The grievance procedure is, in other
 words, a part of the continuous collective
 bargaining process. It, rather than a strike,
 is the terminal point of a disagreement. 

United Steelworkers of America v. Warrior & Gulf Navigation Co.,
363 U.S. 574, 578-79 (1960)(footnotes and citations omitted). 
 Thus the exhaustion requirement in federal labor law
serves to protect the integrity of collective bargaining as a
whole. No comparable interests would be served by enforcing an
exhaustion requirement here. Brennan is not seeking to vindicate
contractual rights secured through the collective bargaining
process; rather, he is suing to vindicate individual rights
conferred by federal and state law. Furthermore, as the discussion
in part II.B above demonstrates, the "arbitration" provided by the
university's contract with Brennan is, with respect to tenure
disputes, neither capable of rendering a binding judgment nor
contractually mandatory. Thus it does not share the usual features
of the grievance and arbitration mechanisms typical of collective
bargaining agreements. The arbitration clause at issue here is not
a vehicle for giving meaning to a "generalized code," but a
mechanism that can be fairly characterized as contemplating a
purely advisory function within a narrowly circumscribed grant of
jurisdiction. Consequently, we conclude that Brennan was not bound
to exhaust the arbitration aspect of the handbook procedure before
bringing his discrimination claims. 
 2. Brennan's State-Law Claim for Breach of Contract
 Although there is no source of law indicating that
Brennan was bound to exhaust the contractual grievance mechanism
prior to bringing suit on his federal and state statutory and his
state constitutional claims, Massachusetts law does require, at
least in some instances, that contractual grievance procedures be
pursued before suit may be brought under the common law of
Massachusetts for breach of an employment contract. In O'Brien v.
New England Telephone & Telegraph Co., 664 N.E.2d 843, 849 (Mass.
1996), the Supreme Judicial Court of Massachusetts held that when
an employee manual constituting an enforceable contract of
employment sets up a grievance procedure, an employee who refuses
to use that procedure may not resort to a judicial forum to assert
claims of wrongful discharge based on that manual. 
 The plaintiff in O'Brien sued for wrongful discharge,
basing her claim upon an employee manual that set forth a four-step
grievance procedure for claims "that an employee has, in any
manner, been unfairly treated." Id. at 849. O'Brien, however,
declined to invoke the manual's procedures and instead brought her
wrongful discharge action in state court. After O'Brien won a jury
verdict, the Supreme Judicial Court of Massachusetts granted direct
review and reversed.
 The court ruled that the manual not only created rights
enforceable by the employee, but also obligations that bound the
employee. Id. at 848-49. The court concluded that O'Brien was
obligated to pursue the contractual grievance procedures set forth
in the manual:

 When a collective bargaining agreement
 provides a grievance procedure, the general
 rule is that the remedies specified in the
 agreement be exhausted before an employee may
 resort to the courts. . . . . We see no
 justification for treating differently an
 employee asserting rights under a personnel
 manual that contains a grievance procedure
 . . . .

 The grievance procedure provided a ready
 means by which O'Brien could have brought to
 the attention of management [a supervisor's]
 unfair treatment of her . . . . Pursuit of
 this available process might have demonstrated
 sufficient mitigating circumstances to rebut
 what management might otherwise have perceived
 as "gross violations" of rules or law that
 were "cause for immediate discharge."

Id. at 849. Hence, we take O'Brien as a determination that, as a
matter of Massachusetts employment law, one who alleges wrongful
termination based upon a contract of employment which includes a
grievance procedure cannot seek vindication of the claim in court
without first invoking the contractual grievance procedure. 
 Since Brennan's claims of common-law breach of contract
are predicated upon a contract of employment containing a grievance
procedure, we find that these claims are not meaningfully
distinguishable from the claims pursued in O'Brien. In light of
the Supreme Judicial Court's ruling in O'Brien, then, we conclude
that, under Massachusetts law, Brennan was required to pursue the
grievance procedure outlined in his contract of employment before
maintaining suit for breach of the employment contract, and we
therefore affirm on that issue.
 Conclusion
 For the foregoing reasons the judgment of the district
court granting summary judgment in favor of the defendants is
reversed with respect to Brennan's non-contractual claims. The
district court's judgment is affirmed as to Brennan's claims of
breach of contract. The case is remanded for further proceedings
consistent with this opinion.