USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-2253

 JOHN A. HINCHEY,

 Plaintiff, Appellant,

 v.

 NYNEX CORPORATION, and 
 TELESECTOR RESOURCES GROUP, INC.,

 Defendants, Appellees.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. George A. O'Toole, Jr., U.S. District Judge]

 Before

 Bownes and Cyr, Senior Circuit Judges,
 
 and Stearns*, District Judge.
 
 

 Kevin M. Akre for appellant.
 Barry A. Guryan, with whom, Michael J. Tuteur, Karen K. Burnsand Epstein, Becker & Green, P.C., and Amy B. Seifer, Counsel, Bell
Atlantic Corporation, were on brief for appellees.

May 20, 1998

 
_________________________

 *Of the District of Massachusetts, sitting by designation. BOWNES, Senior Circuit Judge. Plaintiff John A. Hinchey 
brought this diversity action against his former employer, NYNEX
Corporation ("NYNEX") and Telesector Resources Group, Inc. ("TRG")
for damages arising from his alleged wrongful termination. 
Specifically, plaintiff's claims include breach of contract,
promissory estoppel, intentional misrepresentation, fraud and
deceit, negligent misrepresentation, intentional and negligent
infliction of emotional distress, and wrongful discharge in
violation of public policy. It is Massachusetts substantive law
that controls. The district court judge granted defendants' motion
for summary judgment, based primarily on his determination that
plaintiff had not provided sufficient evidence on any of his
seventeen claims to warrant a jury trial. We affirm.
 I.
 Facts Viewed in the light most favorable to the nonmoving party
(Hinchey), the following facts are treated as undisputed for
purposes of summary judgment. See Dubois v. United States Dep't of
Agric., 102 F.3d 1273, 1284 (1st Cir. 1996), cert. denied, 117 S.
Ct. 2510 (1997). 
 In October 1965, plaintiff Hinchey began working for New
England Telephone as a candidate for the Initial Management
Development Program ("IMDP"). After working in various technical
management positions and receiving positive evaluations, Hinchey
was promoted in 1982 and became responsible for Corporate
Communications. From August 1991 until April 1993, he was an
acting Assistant Vice President. At the time of his termination,
Hinchey held the position of Director of Technical Support in the
Information Services Organization within TRG.
 On April 15, 1983, the Company distributed its Code of
Business Conduct ("1983 Code" or "the Code") to all employees. The
purpose of the Code was to acquaint employees with the Company's
"core values" and ethical standards. In essence, these values and
standards amounted to an espousal of responsible and legal behavior
on the part of employees and the Company. The 1983 Code also
included a non-retaliation provision which assured an employee
protection against reprisal for reporting violations of the Code. 
All employees were required to acknowledge their assent to the
provisions of the Code with a signature. Because Hinchey believed
that the Code, once signed, would be a binding document, he added
the following statement before signing it:
 I love the Bell System and New England Tel[]
 Co[], but I am not "satisfied" with my
 progress to date and cannot, in conscience[,]
 fully support all existing interpretations of
 corporate policy. Therefore I cannot exclude
 the possibility of initiating external review
 of these concerns and situations. However, my
 objective continues to be to work toward the
 betterment of the Company as well as myself. 
 

Ed McCauley, Hinchey's supervisor at the time, was aware of
Hinchey's intention to add the statement. He was uncertain,
however, how it would be interpreted by upper-level management and
cautioned Hinchey to carefully consider his decision to add it. In
the end, Hinchey added the statement and considered it to be a
negotiated-for exception to portions of the Code which prohibit
public disclosure of company policies or practices. Despite the
added statement, Hinchey thought the non-retaliation provision
still applied to him. In fact, he believed that the added
statement solidified his perception that the Code was a binding
contract between the Company and himself.
 NYNEX revised its Code of Business Conduct in 1992 and
1993, adding, inter alia, a statement expressly disclaiming any
contractual obligations. Although Hinchey received copies of the
1992 and 1993 codes, he did not question the Company's right to
alter the substance of the 1983 Code. Rather, Hinchey continued to
assume that his added statement to the 1983 Code was in effect and
provided him a contractual exception to the corporate policy of
confining complaints within the Company's framework. 
 In January 1992, NYNEX implemented a Force Management
Plan ("FMP") to regulate force reduction procedures for management
personnel. Once a force surplus is perceived, the FMP outlines a
detailed procedure by which to identify employees in the surplus
job categories and assess them against defined criteria. A
Supervisor's Guide was issued to all management to assist in the
downsizing process. The FMP contained an explicit disclaimer:
 The FMP Guidelines are not inflexible, do not
 constitute a contract of employment, and
 should not be interpreted as creating a
 contract of employment, either expressed or
 implied. The employment relationship between
 the Corporation and its management employees
 is by mutual consent (employment-at-will), and
 may be terminated by either the Corporation or
 the employee at any time for any reason
 . . . . These guidelines may be changed
 unilaterally by the Corporation at any time
 and for any reason . . . . Nothing in these
 guidelines should be interpreted as a
 limitation, either expressed or implied, on
 the Corporation's right to discharge or
 otherwise discipline its employees.

NYNEX Force Management Plan Resource Guide. Despite the
disclaimer, Hinchey believed that the FMP had been followed in all
force reductions that he knew of and that it therefore was a
"mandatory and binding procedure" which would be followed in the
future.
 On May 5, 1992, Hinchey began discussions with his direct
supervisor, Vice President Joseph Castellano, regarding "business
and procurement irregularities" allegedly perpetrated by NYNEX. 
Hinchey complained that he had observed a "pattern of negligence
and closed-mindedness" within NYNEX for twenty-five years that he
thought clearly violated the Code of Business Conduct. Hinchey
asserts that Castellano made no attempt to address his concerns or
end the irregularities.
 In early 1993, Hinchey received his performance appraisal
for 1992. Despite mostly positive feedback, he received what he
considered to be a negative evaluation in the "Communication"
category. Hinchey knew that such an evaluation might lead to
termination under the FMP, so he approached Castellano on
February 24, 1993, to talk about a voluntary separation plan for
himself. Hinchey's proposed plan included, inter alia, a
stipulation that he would receive two years "net credited service"
in return for his voluntary separation. "Net credited service"
refers to the number of years an employee has worked at NYNEX. The
Company's retirement plan specified that an employee with less than
thirty years of service to the Company (i.e., thirty years of net
credited service) at the time of retirement would be subjected to
a pension reduction. Because he had been employed at NYNEX for
only twenty-eight years, his separation proposal included a
stipulation that he would be given two extra years of net credited
service in order to ensure a full pension. Castellano told Hinchey
that he would consider his proposal. Hinchey heard nothing further
about his plan for several months.
 On July 19, 1993, Hinchey called Ivan Seidenberg, Vice-
Chairman of NYNEX, to schedule an appointment during which Hinchey
could discuss his allegations of irregularities. One hour later,
Hinchey received a phone call from Castellano, during which
Castellano stated, "Of course you can talk with Ivan [Seidenberg]
if you wish but I have worked out just what you want." Hinchey
responded, "Joe [Castellano], that's not what I want, that's what
I said I would accept back in February." He also said, "Now you
have demoted me and have ruined my career and now you've ruined my
reputation and unless I get a permanent promotion I am going to
talk it over with Ivan. I don't understand why you couldn't have
just talked with me and have been straight with me." Pl.'s Aff.
dated July 10, 1997, at 10. 
 On August 5, 1993, Hinchey met with Castellano and was
terminated. Hinchey's termination papers indicated that he was
discharged under the FMP. At that meeting, Hinchey was told by
Castellano that he would receive the net credited service he had
requested, even if it had to be paid out of departmental funds. 
Castellano instructed Hinchey to see William Coffey, Director of
NYNEX's Human Resources Department, to "work it out." When Hinchey
spoke to Coffey, however, Coffey stated that a grant of net
credited service could not be provided within the framework of an
FMP termination, but that he would work on it with Castellano. On
one or two other occasions, Castellano reasserted his promise to
Hinchey, telling him to submit a voucher for the net credited
service. When Hinchey submitted a voucher to Castellano, however,
Castellano sent it back to him with a note explaining that he
needed to see Coffey regarding this issue. Hinchey never received
the two years net credited service that Castellano promised he
would receive. 
 Subsequent to his termination, Hinchey canceled his
scheduled meeting with Seidenberg. He persisted, however, in
trying to set up a conference with Seidenberg. In December,
Seidenberg finally met with Hinchey, but Hinchey asserts that the
one and a half hour meeting did not provide sufficient time to
cover all of his concerns. As a result, Hinchey sent Seidenberg a
series of letters with attachments detailing the company policies
and practices with which he was concerned. During this time,
Hinchey was also in contact with Bill Pucci, NYNEX's Managing
Director - Office of Business Conduct. Pucci informed Hinchey
that, in an effort to settle the matter, Seidenberg would be
willing to offer him a short-term position as a consultant, two
years of net credited service equivalent in an annuity, and access
to an executive placement service. Hinchey responded that the
proposal did not offer what he considered to be appropriate
compensation considering the damage his reputation had suffered. 
Hinchey later stated to Pucci, "I would consider a million dollars
appropriate if they hired me back, and . . . if I'm left with
nothing, no reputation, 10 million dollars wouldn't be enough." 
Hinchey Dep. dated February 13, 1997, at 97. Although Hinchey
indicated that these dollar amounts were not "hard numbers," no
final agreement between Hinchey and Seidenberg was reached, and
Hinchey consequently brought this lawsuit.
 II.

 Standard of Review
 We review the district court's grant of summary judgment
de novo. See Dubois, 102 F.3d at 1283. Summary judgment may be
granted only when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence
of some alleged factual dispute between the parties will not defeat
an otherwise properly supported motion for summary judgment. . . ." 
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). 
Rather, to be considered material, a disputed fact must have the
potential to "affect the outcome of the suit under the governing
law." Id. at 248.
 The party moving for summary judgment, here the Company,
bears the initial burden of demonstrating that there are no genuine
issues of material fact for trial. See Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986). This burden "may be discharged by
'showing' that is, pointing out to the district court that
there is an absence of evidence to support the nonmoving party's
case." Id. at 325. After such a showing, the "burden shifts to
the nonmoving party, with respect to each issue on which he has the
burden of proof, to demonstrate that a trier of fact reasonably
could find in his favor." DeNovellis v. Shalala, 124 F.3d 298, 306
(1st Cir. 1997) (citing Celotex, 477 U.S. at 322-25). 
 In the end, upon examining the facts in the light most
favorable to the nonmoving party and drawing all reasonable
inferences in his favor, see Dubois, 102 F.3d at 1284, we are
required to determine if "there is sufficient evidence favoring the
nonmoving party for a jury to return a verdict for that party." 
Anderson, 477 U.S. at 249.
 III.
 Breach of Contract Claims
 Hinchey's brief is somewhat unclear as to what alleged
agreements he is referring to in asserting his breach of contract
claims. As we understand it, he has asserted that three binding
contracts between him and NYNEX were in existence: the 1983 Code,
the FMP, and the oral promise of net credited service. 
 A. Code of Business Conduct and Force Management Plan
 It is well settled in Massachusetts that employment is
presumed to be at-will unless there exists an express or implied
contract governing its terms and conditions. See Jackson v. Action
for Boston Community Dev., Inc., 525 N.E.2d 411, 412 (Mass. 1988). 
The Massachusetts Supreme Judicial Court ("SJC") has determined
that a personnel manual may, in some cases, form the basis of such
a contract. See O'Brien v. New England Tel. & Tel. Co., 664 N.E.2d
843, 847 (Mass. 1996) (citing Jackson, 525 N.E.2d at 415); see alsoHobson v. McLean Hosp. Corp., 522 N.E.2d 975, 977 (Mass. 1988).
 There is no explicit test or "rigid list of
prerequisites" to aid in ascertaining if a personnel manual
comprises a binding contract under Massachusetts law. O'Brien, 664
N.E.2d at 847. Rather, factfinders must consider several factors
recently articulated by the SJC in Jackson, 525 N.E.2d 411, which
held that no implied contract based on the terms of the personnel
manual existed where: 1) the employer retained the right to
unilaterally modify terms; 2) the terms of the manual were not
negotiated; 3) the manual stated that it provided only guidance
regarding the employer's policies; 4) no term of employment was
specified in the manual; 5) the employee did not sign the manual to
manifest assent. Id. at 415-16. The SJC has clarified that these
factors are not an inflexible list, but rather a set of
circumstances which would "make a difference or might make a
difference in deciding whether the terms of a personnel manual were
at least impliedly part of an employment contract." O'Brien, 664
N.E.2d at 847. Stated another way, these factors help determine if
an employee could reasonably have believed that the "employment
manuals he or she was given constituted the terms or conditions of
employment, equally binding on employee and employer." Derrig v.
Wal-Mart Stores, Inc., 942 F. Supp. 49, 55 (D. Mass. 1996) (citing
O'Brien, 664 N.E.2d at 848-49).
 The first issue is whether it was objectively reasonable
for Hinchey to believe that the terms of the 1983 Code comprised
mutually binding contractual obligations. The added statement, 
essentially declaring that Hinchey did not assent to the full terms
of the Code, did not make the Code mutually binding. His assertion
that the added statement constituted a negotiated-for exception to
the Code is based on an assumption that has no legal or factual
foundation. Hinchey has produced no evidence showing or tending to
show that McCauley (the supervisor present when the statement was
added) had actual authority to negotiate exceptions to the 1983
Code. Nor was there any evidence of apparent authority, which
"'results from conduct by the principal which causes a third person
reasonably to believe that a particular person . . . has authority
to enter into negotiations or to make representations as his
agent.'" Linkage Corp. v. Trustees of Boston Univ., 679 N.E.2d
191, 203 (Mass.), cert. denied, 118 S. Ct. 599 (1997) (alteration
in original) (quoting Hudson v. Massachusetts Property Ins.
Underwriting Ass'n, 436 N.E.2d 155, 159 (Mass. 1982)).
 Furthermore, even if McCauley had possessed authority to
negotiate a contractual exception to the Code, there is no evidence
that any real negotiations occurred. Hinchey himself testified in
a deposition that his supervisor counseled against adding the
statement. That Hinchey added it anyway does not demonstrate that
a negotiation about the terms of the Code took place. In addition,
the ambiguous language of the statement cannot be read as an
exemption to a specific provision. Rather, the statement appears
to be a general exception allowing Hinchey the opportunity to
decide in the future whether or not he will abide by the Code. 
Accordingly, we find that no rational juror could conclude that it
was objectively reasonable for Hinchey to believe that the 1983
Code was mutually binding on him and the Company.
 Hinchey's claim regarding the breach of the FMP also
fails as a matter of law. Hinchey asserts that there is a disputed
issue of material fact regarding whether proper FMP procedures were
followed prior to his termination. We need not reach that issue,
however, because we find that the FMP contained no binding
contractual obligations. There is simply a dearth of evidence in
the record supporting Hinchey's contention that he reasonably
believed the FMP was a "mandatory and binding procedure." Clearly,
there was no negotiation regarding the terms of the manual, nor was
there a term of employment specified within it. Further, there was
an explicit disclaimer, in which NYNEX retained the right to
unilaterally modify the FMP. Hinchey, by his own assertion, was
extremely knowledgeable of the FMP and proficient in its
implementation. Accordingly, a rational juror could only conclude
that Hinchey's awareness of the disclaimer, in addition to the
absence of any negotiation or specified term of employment, made it
unreasonable for him to claim the FMP as a source of contractual
rights. 
 B. Net Credited Service Hinchey asserts that the Company's oral promise (made by
Castellano) to give him two years of net credited service was a
contractually binding agreement. To survive summary judgment on
this claim, Hinchey must provide evidence sufficient for a
reasonable juror to find that he proved each element of the
contract. See Celotex, 477 U.S. at 322. We examine first the
factual foundation for Hinchey's oral contract claim.
 Stripped to their essentials, the facts are as follows. 
Hinchey proposed to Castellano that he would retire voluntarily if
he were given two years net credited service so as to bring his
twenty-eight years of service up to thirty years, thus giving him
a full pension. Six months later, Castellano told Hinchey that he
had "worked out just what you want." Hinchey rejected this offer
and told Castellano that he wanted a permanent promotion. Hinchey
met with Castellano a month later and was terminated under the FMP.
He was told by Castellano that he would receive the two years net
credited service. There is no doubt that Hinchey was given the
run-around by Castellano and Coffey when he attempted to obtain the
net credited service. This, however, did not deter him from
pursuing Seidenberg, Vice-Chairman of NYNEX. He was also in
contact with Pucci, Director of NYNEX's Office of Business Conduct. 
Pucci told him that Seidenberg was willing to offer him a short-
term position as a consultant, two years of net credited service
equivalent in an annuity and access to an executive placement
service. Hinchey rejected this offer and later told Pucci that he
"would consider a million dollars appropriate, if they hire me
back."
 Hinchey rejected the two oral offers made by the Company,
upping the ante each time. Clearly, there was no meeting of the
minds and hence no contract. See Jamestown Portland Cement Corp.v. Bowles, 117 N.E. 41, 43 (Mass. 1917).
 Moreover, there could be no oral contract because of the
failure of consideration by Hinchey. The promises relied upon by
Hinchey were made after his termination. "[I]n order for a
contract to have valid consideration, the contract must be a
bargained-for exchange in which there is a legal detriment of the
promisee or a corresponding benefit to the promisor." Frankina v.
First Nat'l Bank of Boston, 801 F. Supp. 875, 886 (D. Mass. 1992),
aff'd, 991 F.2d 786 (1st Cir. 1993) (citing Graphic Arts Finishers,
Inc. v. Boston Redevelopment Auth., 255 N.E.2d 793, 795 (Mass.
1970)). Legal detriment means "'giving up something which
immediately prior thereto the promisee was privileged to retain, or
doing or refraining from doing something which he was then
privileged not to do, or not to refrain from doing.'" Graphic Arts
Finishers, Inc., 255 N.E.2d at 795 (quoting Williston, Williston on
Contracts 102A (3d ed. 1957)). 
 Castellano reiterated the offer of net credited service
to Hinchey after Hinchey was terminated. At that point, however,
there could be no consideration. Hinchey was no longer working for
NYNEX and could not give anything of value in exchange for the
promise. The same is true for Seidenberg's offer. The plaintiff's
characterization of the promise as a contract fails as a matter of
law because of lack of consideration. For the reasons stated, we
affirm summary judgment on this count.
 IV.
 Promissory Estoppel
 As an alternative to his contract claim, Hinchey argues
that he is entitled to damages on the basis of promissory estoppel. 
Specifically, he alleges that the promises NYNEX made regarding the
1983 Code, FMP, and net credited service should be enforceable.
 Under the doctrine of promissory estoppel in
Massachusetts, "'"[a] promise which the promisor should reasonably
expect to induce action or forbearance on the part of the promisee
or a third person and which does induce such action or forbearance
is binding if injustice can be avoided only by enforcement of the
promise."'" Veranda Beach Club Ltd. Partnership v. Western Sur.
Co., 936 F.2d 1364, 1380 (1st Cir. 1991) (quoting McAndrew v.
School Comm. of Cambridge, 480 N.E.2d 327, 332 (Mass. App. Ct.
1985) (quoting Restatement (Second) of Contracts 90(1) (1981))). 
To prove his promissory estoppel claims, Hinchey must adduce
evidence of, inter alia, reliance that is, he must demonstrate
that he undertook an "'act or omission resulting from'" NYNEX's
representations. Presto v. Sequoia Sys., Inc., 633 F. Supp. 1117,
1120 (D. Mass. 1986) (quoting Cellucci v. Sun Oil Co., 320 N.E.2d
919, 923 (Mass. App. Ct. 1974), aff'd, 331 N.E.2d 813 (Mass.
1975)). Because Hinchey has failed to produce sufficient evidence
of reasonable reliance as to any of his three claims, we find that
they fail as a matter of law.
 In regard to the oral promises of net credited service,
Hinchey has not adduced adequate evidence of reliance. Hinchey
asserts that he ceased his pursuit of higher-level review of his
1992 appraisal and terminated his employment search in reliance on
the Company's promises. It is irrelevant that, prior to
termination, Hinchey abandoned his efforts to get higher-level
review of the appraisal. As discussed supra, he had rejected a
promise of two years net credited service prior to termination. 
Therefore, the only claims which could be viable are the promises
of net credited service made subsequent to termination. To survive
summary judgment on this claim, Hinchey would have had to produce
evidence demonstrating that, after being terminated, he decided not
to reinitiate review because of the Company's promises of net
credited service. No such evidence exists. On the contrary,
Hinchey vigorously pursued Seidenberg (Vice-Chairman of NYNEX). 
Among other things, Hinchey met with him for one and a half hours. 
He took the opportunity to complain about a variety of things and
provided Seidenberg with information regarding his 1992 appraisal,
calling it "[a] gross instance of discrimination and prejudice," in
the hopes that Seidenberg would rehire him. There is no evidence
that the Company's promises in any way induced Hinchey to avoid or
forego an effort to reverse any employment decision.
 Hinchey's second assertion that he terminated his
employment search also fails. Hinchey has not offered evidence
demonstrating that, subsequent to termination, he chose not to seek
outside employment in reliance on the Company's promises. The
record indicates that Hinchey's reason for not pursuing employment
was that he thought that his termination ruined his reputation and
chances of getting hired. There is no evidence that the Company's
promises of net credited service induced Hinchey to cease his
pursuit of employment. In fact, Hinchey did not sit idly by,
satisfied with the prospect of net credited service; rather, he
pursued Seidenberg with hopes that Seidenberg would rehire him. As
a matter of law, the Company's post-termination promises did not
cause Hinchey to change his position in any legal sense. SeeCelucci, 320 N.E.2d at 923.
 Hinchey has also failed to provide sufficient evidence of
reliance on the promises NYNEX made to him in the FMP. There is
nothing on the record which would support a reasonable juror's
finding for Hinchey on this claim. Again, Hinchey's bald
assertions of reliance that he ceased his pursuit of higher-level
review and terminated his employment search are completely
unsupported by evidence.
 Finally, the promissory estoppel claim based on the 1983
Code also fails. In order to survive summary judgment, Hinchey
must provide evidence demonstrating that, in reliance on the non-
retaliation provision, he made complaints regarding violations of
the Code. Hinchey has failed to provide such evidence. 
 There is no evidentiary support for Hinchey's contention
that he relied on the Code's protection. The record indicates that
Hinchey's actions were not within the scope of the Code's
protection. Rather, his complaints, as memorialized in the letters
sent to Seidenberg subsequent to termination, dealt with
discretionary, internal policies of the Company. Although he
characterizes these policies as being "unbelievable" and "gross[ly]
negligen[t]," Hinchey does not adduce evidence demonstrating that
these policies were in fact violations of the Code. His complaints
tended to deal with technology decisions which Hinchey believed to
be inefficient or wasteful. For example, critical of NYNEX's
decision to invest in certain software development products,
Hinchey wrote to Seidenberg, "Managers and non[-]technical
charlatans who had never deployed a major commercial application,
were making reckless and irresponsible acquisitions based purely on
pretty pictures and salesmen's hype." Compl., Ex. 13 at 4. Other
examples of Hinchey's dissatisfaction with policies and decisions
made by NYNEX abound. But without specific evidence demonstrating
that such internal matters were illegal or otherwise violated the
Code, Hinchey cannot claim that he made these complaints in
reliance on the Code.
 We note, however, that Hinchey has made some allegations
of "anti-trust and procurement irregularities." Such allegations
address behavior which is specifically covered in the Code and, if
supported by the record, might therefore constitute evidence of
Hinchey's reliance on the Code. Specifically, Hinchey stated that
the Company "purchase[d] supplies and materials from unqualified []
over[-]priced and/or extraneous vendors in violation of applicable
regulations and law even though significantly superior life cycle
price/performance alternatives were readily available." Compl. 
116-17. As a result of "engaging superfluous/less qualified
vendors," NYNEX caused "economic detriment to ratepayers and
stockholders." Id. The first time Hinchey elaborated on these
allegations of antitrust and procurement abuse was in a deposition,
where he mentioned one possible situation. Although such behavior
would be covered by the Code, we find this single shred of evidence
insufficient to warrant trial. After all, "[T]he mere existence of
a scintilla of evidence in support of the plaintiff's position will
be insufficient; there must be evidence on which the jury could
reasonably find for the plaintiff." Anderson, 477 U.S. at 252. 
 The record is quite clear on the fact that Hinchey spoke
his mind on a variety of issues, without regard for the animosity
or tension he created in so doing. His inclination toward
complaining is evident. The fact that, on one single occasion, he
complained to Castellano about behavior covered by the Code is not
sufficient to support a plausible assertion of reliance in the face
of a plethora of complaints concerning situations not covered by
the Code. In light of all the evidence, no rational juror could
find that Hinchey relied on the 1983 Code in making his complaints.
 V.
 Wrongful Discharge in Violation of Public Policy Massachusetts courts recognize an exception to the
general at-will employment rule "when employment is terminated
contrary to a well-defined public policy." Wright v. Shriners
Hosp. for Crippled Children, 589 N.E.2d 1241, 1244 (Mass. 1992). 
For example: 
 Redress is available for employees who are
 terminated for asserting a legally guaranteed
 right (e.g., filing workers' compensation
 claim), for doing what the law requires (e.g.,
 serving on a jury), or for refusing to do that
 which the law forbids (e.g., committing
 perjury).

Smith-Pfeffer v. Superintendent of the Walter E. Fernald State
Sch., 533 N.E.2d 1368, 1371 (Mass. 1989) (relying on multiple
Massachusetts precedents). Legal redress is also available for
employees "terminated for performing important public deeds, even
though the law does not absolutely require the performance of such
a deed," Flesner v. Technical Communications Corp., 575 N.E.2d
1107, 1111 (Mass. 1991). For example, an internal or external
complaint made about an alleged violation of criminal law, or
"whistle blowing," falls into this category. See Shea v. Emmanuel
College, 682 N.E.2d 1348, 1350 (Mass. 1997). Internal matters,
however, including internal policies, cannot be the basis of a
public policy exception to the at-will rule. See King v. Driscoll,
638 N.E.2d 488, 492 (Mass. 1994); Smith-Pfeffer, 533 N.E.2d at
1371-72; Mello v. Stop & Shop Cos., Inc., 524 N.E.2d 105, 108
(Mass. 1988).
 Hinchey's claim is not one for which Massachusetts courts
have accorded legal redress. Although Hinchey now asserts that he
was terminated for attempting to report NYNEX's antitrust and
procurement abuses, Hinchey's letters to Seidenberg reveal that his
report dealt only with internal matters. In essence, Hinchey's
complaints amounted to no more than specific details about
decisions made by NYNEX management with which Hinchey disagreed. 
 Hinchey asserts that, as a "whistle blower," his
termination violated public policy. See Shea, 682 N.E.2d at 1350. 
A plaintiff in these kinds of cases, however, must provide evidence
 not mere assertion or speculation supporting his claim that he
was terminated for reporting criminal conduct to his superior. Seeid. Hinchey may well have established evidence sufficient for a
jury to find that NYNEX terminated him based on the countless
complaints he made and the animosity those complaints caused. 
Despite his assertions, however, there is nothing in the record
demonstrating that Hinchey was terminated for reporting criminal
conduct. Accordingly, summary judgment was granted appropriately
on this count.
 VI.
 Misrepresentation Hinchey sets forth numerous misrepresentation claims
regarding the terms of the Code and the FMP, as well as the
Company's promise of net credited service and statements regarding
Hinchey's career status. For Hinchey to recover for either
intentional or negligent misrepresentation, he must submit evidence
that NYNEX made false representations and that he reasonably relied
on those misrepresentations. See Robertson v. Gaston Snow & Ely
Bartlett, 536 N.E.2d 344, 349 (Mass.), cert. denied, 493 U.S. 894
(1989). For reasons discussed in section IV, supra, we find that
as a matter of law, Hinchey has not provided sufficient evidence of
reasonable reliance on the Code, the FMP, or promises of net
credited service. See Chedd-Angier Prod. Co. v. Omni Publications
Int'l, Ltd., 756 F.2d 930, 939 (1st Cir. 1985).
 Regarding the career status claims, it is unclear from
his brief specifically what statements Hinchey is alleging as
misrepresentation. In his complaint, Hinchey stated that
Castellano made two misrepresentations regarding his career status. 
The first allegation involved Castellano's pre-termination promise
of a separation plan including net credited service. As we have
noted, supra, Hinchey specifically informed Castellano that he was
no longer interested in that plan. Accordingly, Hinchey cannot
claim that he reasonably relied on a promise he rejected. 
 The second allegation of misrepresentation involved
Castellano's statement that Hinchey was a valued employee in good
standing. Again, Hinchey has not met his burden of demonstrating
reasonable reliance. As discussed in section IV, supra, Hinchey's
assertion that he suspended higher-level review of his 1992
evaluation and terminated his search for employment are unsupported
by evidence. After being informed by Castellano of his good
standing at the Company on July 19, 1993, Hinchey proceeded to
pursue a meeting with Seidenberg in order to discuss how the poor
evaluation and lack of promotion had wounded his reputation and his
chances of finding employment. Hinchey has adduced no evidence
that he would have acted any differently had Castellano not made
the good-standing statement. 
 VII.
 Conclusion
 Although the standards for summary judgment are highly
favorable to the nonmoving party, the nonmovant plaintiff still has
a burden to produce evidence sufficient for a reasonable juror to
find in his favor. Given the dearth of evidence on each of the
seventeen claims, we find that Hinchey has not met that burden. 
The record abounds with conclusory statements and unsupported
allegations, but nothing which would warrant a jury trial. While
we may sympathize with an employee who devoted his time, effort,
and talent to one company for twenty-eight years, we cannot accord
him legal redress where it is unwarranted. Accordingly, the
district court's grant of summary judgment to NYNEX is,
 Affirmed.